[No. F062768. Fifth Dist. Jan. 30, 2013.]

JOHN SCHEENSTRA, Plaintiff and Appellant, v.
CALIFORNIA DAIRIES, INC., Defendant and Appellant.

**COUNSEL**

Law Offices of Brian C. Leighton and Brian C. Leighton for Plaintiff and Appellant.

Fulbright & Jaworski, Robert W. Fischer, Jr., and Andrea M. Valdez for Defendant and Appellant.

**OPINION**

**FRANSON, J.—**

## INTRODUCTION

Plaintiff John Scheenstra was a member of defendant California Dairies, Inc. (Cal Dairies), a member-owned milk marketing and processing cooperative. After Cal Dairies instituted internal production quotas for its members and reduced payments for milk deliveries in excess of the quotas, Scheenstra sued for breach of contract claiming his quota was too low. The contract provision in question obligated Cal Dairies to accept all of the milk of its members, "subject to the right of the Board, in its discretion, upon written notice to the membership . . . to allocate *equitably* among the members on a *uniform basis* . . . the quantity . . . of milk to be received by the Association." (Italics added.)

The trial court concluded that, under the circumstances represented, the business judgment rule did not shield Cal Dairies from liability for breach of contract. The court found that the quota system adopted by Cal Dairies was not equitable or uniform and therefore breached the contract. Among other things, the quota system required dairies with increasing production to bear the entire brunt of the oversupply. More remarkably, the quota system responded to the oversupply problem by placing some members in a better

position than they would have occupied without the oversupply problem. Specifically, members with declining production were given the right to sell their excess quota.

Cal Dairies appealed, contending the trial court erred by (1) failing to apply the business judgment rule and give deference to its board of directors's choice of terms for the production quota system, (2) calculating Scheenstra's damages using a production quota that was contrary to the express terms of the contract, and (3) awarding damages that were not supported by substantial evidence. Scheenstra cross-appealed, contending the trial court should have awarded him the profits he would have earned if his dairy had been brought into full production.

We conclude that the primary question—whether Cal Dairies's board acted within the scope of its discretionary authority—involves a contractual analysis that (1) determines the objective meaning of the contract and (2) applies that meaning to the facts of this case. The contract allowed the board to adopt an internal production quota system that was equitable and uniform. We conclude that the quota system adopted by the board was not equitable and uniform and, therefore, was outside the scope of discretionary authority granted by the contract. Furthermore, on the question of damages, we conclude that the trial court's calculation of what Scheenstra's quota should have been under an equitable and uniform system was consistent with the terms of the contract and the damages awarded were supported by substantial evidence.

We therefore affirm the judgment.

## FACTS

The facts set forth below are taken primarily from the trial court's statement of decision, which incorporates nearly all of the trial court's tentative decision.

### Background

Scheenstra is a third generation dairy operator. Cal Dairies is a California agricultural cooperative organized as a nonprofit cooperative association, without capital stock, pursuant to chapter 1, division 20, of the Food and Agricultural Code. Cal Dairies's articles of incorporation also state that it "is a membership corporation . . . ." Cal Dairies was formed in 1999 by the merger of three predecessor agricultural cooperatives. Three generations of Scheenstra's family were members of Cal Dairies or its predecessors.

The purpose of Cal Dairies is to market members' milk to the best advantage of the members. Cal Dairies has an 18-member board of directors. All directors are dairy owner-members of Cal Dairies. The board exercises its powers as set forth in Cal Dairies's bylaws (Bylaws).

A person or business that wishes to become a member of Cal Dairies submits an application, which the board accepts or rejects. In the application, the member agrees to be bound by the Bylaws as they exist and as they may be amended. Cal Dairies and Scheenstra agree that the Bylaws constitute the contract between them, which contract sometimes is referred to as the member agreement.

In 2001, Scheenstra was a member of Cal Dairies with a dairy in Tipton. He was considering expansion, which he could have done at the Tipton dairy without a new application and without the consent of, or advanced notice to, Cal Dairies.

*Scheenstra Expansion*

In 2002, Scheenstra purchased approximately 600 acres in Wasco as a potential site for a new dairy. Shortly thereafter, Scheenstra talked about his plans for a new dairy with Lynn McPhetridge, his field man and Cal Dairies's designated link to Scheenstra. Scheenstra told McPhetridge that (1) he planned a 4,100-cow dairy, milking three times a day; (2) the dairy would be stocked with fresh heifers[1] and would not reach full milk production until about two years after milking started; and (3) he expected to start production in 2005.

Scheenstra told McPhetridge that he was seeking financing for the anticipated $30 million development cost, and that he wanted to be sure he had a "home" for the milk before he committed to the investment. McPhetridge told Scheenstra that "it would not be a problem."

On October 5, 2004, Scheenstra submitted his application to Cal Dairies for membership for the Wasco dairy. Later that month, the board approved the membership, stating it would become effective on September 1, 2005, and including the note: "Plus 150,000 lbs." The note, which came from McPhetridge's supervisor, was intended to indicate an anticipated production level for informational purposes and was not a production limit.

Scheenstra had problems obtaining governmental clearances and permits for the new dairy and its completion was delayed. Scheenstra kept McPhetridge advised at all times of the status of the dairy development.

---

[1] In this context, "fresh" means giving milk and "fresh heifer" refers to a young cow that has recently calved and is in her first lactation.

Eventually, Scheenstra's new dairy was built in two phases, with two milking parlors. Production on the first phase began in December 2006, with fresh heifers. The minutes of the December 19, 2006, Cal Dairies board meeting noted for informational purposes only that Scheenstra's new dairy would start operations on December 19, 2006, and further noted, "Plus 290,000 lbs."

In June 2007, the second parlor was completed and it was stocked with fresh heifers in November 2007. By the time of trial in January 2010, these cows had reached full production.

*Oversupply of Milk*

In the fall of 2007, the board began considering the need to reduce milk production by its members. The board had anticipated that its new Visalia plant would be in operation by then, but it did not start until February 2008. Also, some large customers had reduced their purchases from Cal Dairies and some members, using gains from high milk prices in 2007, had expanded their herds and production.

At its November 27, 2007, meeting, the board approved two new members with production totaling over 36,000 pounds and then placed a 90-day moratorium on accepting new dairies. In addition, the board directed staff both to (1) review recently approved members and compare their actual production with the member's indicated and approved anticipated full production and (2) survey long-standing members to see what expansion they already had in process (for which no board approval was required).

The staff review resulted in a finding that there was an increase of 1.5 million pounds, from the previously stated anticipated production to the actual production for the relatively new members, and an additional 2.0 million pounds for established dairies in the process of expanding. These additional 3.5 million pounds would put Cal Dairies well above its handling capacity.

The board also was aware that there was an industrywide oversupply of milk and other cooperatives had adopted programs to reduce member production.

*Adoption of Quota System*

The board decided to exercise its discretionary authority granted in section 7.3 of the Bylaws and institute a program to restrict supply and keep deliveries within Cal Dairies's capacity to handle. Cal Dairies's decision to adopt an internal production quota system is not challenged in this lawsuit.

To implement such a system under the Bylaws, the board is required to assign an internal production quota (i.e., a base) to each member and to treat milk delivered by the member in excess of that quota as having a lesser value.

The board considered setting the base at the February 2008 production and at the highest 2007 production, but rejected both because those amounts exceeded Cal Dairies's capacity. At its February 26, 2008, meeting, the board voted against a motion to set the base at December 2007 production plus 5 percent, an amount which also appears to have been in excess of Cal Dairies's capacity. Eric Erba, Cal Dairies's senior vice-president of government and producer relations, and senior staff prepared a proposed "supply management program" for presentation to the board. This proposal set the base at the 2007 average daily production. Later at that meeting, the board passed a motion to approve a program that (1) used the average daily production for 2007 as the base, (2) allowed members to apply for adjustments because of hardship and, (3) established a hardship committee to review requested adjustments. The program was to become effective April 1, 2008, and expire after six months unless renewed by the board.

The board's February 26, 2008, minutes indicated that Cal Dairies's milk handling capacity at the time was 48,130,000 pounds per day. In comparison, the March and April 2008 board minutes include a projection that the milking handling capacity was 49,630,000 pounds per day. This amount was also set forth in trial exhibit 24, a staff writeup of the hardship appeals.

The staff writeup also stated the average daily production for 2007 was 47,858,498 pounds per day. With upward adjustments (414,498 pounds) that annualized the production from 13 dairies that operated only part of the year, the production figure was raised to 48,272,996 pounds per day. The trial court noted that this adjusted 2007 production figure barely exceeded Cal Dairies's stated capacity in early 2008, which was 48,130,000 pounds per day.

At the time the board adopted the supply management program, it knew (1) there were dairies with declining production, allocating a base using an annual average would provide those dairies with a base in excess of their actual production, and such excess base would be a saleable asset; (2) there were a number of dairies, including Scheenstra's, with increasing production, to the extent of approximately 3.5 million pounds;[2] (3) Scheenstra's dairy, to which the formula allocated a base or quota of 202,000 pounds, had an anticipated production of 290,000 pounds and an actual December 2007 production of 261,764 with an upward curve; and (4) the base allocation

---

[2] This number comes from staff surveys and research.

would not account properly for dairies with increasing production.[3] Nevertheless, the board decided to defer these "most difficult" cases to the hardship committee established at the February 26, 2008, board meeting.

*Hardship Committee and Recommended Allocation Adjustments*

By letter dated February 26, 2008, from Cal Dairies's chief executive officer, members were advised that if "a member contends that he will incur an extreme hardship, the Board or its representative upon written request of the member, may review the member's allocation and may readjust such allocation in a manner that is fair and just." No basis for possible review other than "extreme hardship" was stated.

Cal Dairies notified Scheenstra by letter dated March 4, 2008, that his base allocation was 202,000 pounds per day and that any milk delivered in excess of the allocation would be charged the costs incurred in shipping, handling, selling, disposing and accounting for the handling of such milk. The letter again advised Scheenstra that he could submit "for consideration" arguments regarding "extreme hardship."

Scheenstra phoned the chief executive officer and his field man McPhetridge to complain. On March 24, 2008, he filed a request for additional base allocation with the hardship committee. McPhetridge agreed that the facts stated in Scheenstra's letter to the hardship committee were accurate.

The hardship committee consisted of three nonboard members familiar with the dairy business. The committee's power was limited to making a recommendation to the board. The committee was given an allowance of 1.7 million additional pounds it could allocate among those claiming hardship.

The hardship committee met for the first time on March 26, 2008, and developed criteria for the consideration of member requests. Members were not told what the criteria were before their requests were required to be submitted.[4]

One of the hardship categories concerned any dairy of which the original production base allocation (1) was less than 90 percent of the dairy's February 2008 production and (2) no significant increase in milk production would be expected within the next six months. If the criteria were met, the

---

[3] This information was provided to the board by Erba.

[4] The criteria were set forth in the staff writeup of the hardship appeals (i.e., trial exhibit 24). The criteria were disclosed to the members for the first time in Erba's April 30, 2008, letter that explained the process for appealing a decision by the hardship committee.

dairy would be approved for an additional production base to bring the dairy's base allocation to 90 percent of February 2008 production.

Another hardship category was based on whether the committee could verify that (1) the dairy had made a substantial financial commitment to a facility in 2007 with the expectation of significant milk production, or (2) the dairy had begun initial operations as a previously board-approved, newly acquired dairy in 2007 *and* was allocated significantly less production base than (a) was previously approved by the board or (b) the dairy's current production. If these criteria were met, the base would be increased to equal 80 percent of the volume of milk that the committee projected the dairy would be producing in six months.

Scheenstra originally was placed in the latter category (80 percent of projected production), but the committee felt more comfortable moving him to the category providing for 90 percent of February production, even though it would give Scheenstra a smaller adjustment. The committee allocated an additional 5,816 gallons (about 50,000 pounds) to Scheenstra's base, for a total of 252,000 pounds per day. At the time, Scheenstra was producing 287,757 pounds per day. Cal Dairies notified Scheenstra of the new allocation by letter dated April 3, 2008.

At its April 22, 2008, meeting, the board voted to endorse the hardship committee's methods and recommendations for additional allocations. The committee had recommended increasing the allocations about 1,250,000 pounds, which was significantly less than the 1,700,000 pounds allotted to the committee.

*Appeals from Hardship Committee Decision*

Cal Dairies advised its members in an April 30, 2008, letter that they could appeal the hardship committee's decision, but limited the appeal to whether the committee properly applied its own criteria. Also, the members were informed what the criteria were for the first time. The persons handling the appeals were Erba and Mr. Korsmeier, a former chief executive officer.

In a letter dated May 13, 2008, Scheenstra appealed the committee's recommendation. He argued his dairy would not be economically viable if it had to reduce its anticipated production of 319,800 pounds per day by 20 percent and that such a reduction would result in extreme financial hardship.

Erba and Korsmeier recommended 11 dairies for an increase totaling of 75,990 pounds, but did not recommend an increase for Scheenstra. At its May

27, 2008, meeting, the board approved these recommendations. Cal Dairies advised Scheenstra that his appeal was denied by letter dated May 30, 2008.

Scheenstra asked to meet directly with the board and, by letter dated July 1, 2008, was told that he would be given five minutes at the July 22, 2008, meeting. Scheenstra presented a letter and spoke to the board. Erba's memo to the board recommended that Scheenstra's appeal be denied, stating that it did not have much merit. The memo erroneously stated that Scheenstra's dairy "was Board approved at 150,000 lbs" when his membership was accepted in 2004. Erba also referred to the 290,000 pounds noted in the minutes for the December 2006 board meeting and stated that the board did not take any action to approve this increase in milk production.

Cal Dairies advised Scheenstra by letter dated July 24, 2008, that his assigned base "cannot be adjusted at this time."

During this process, Scheenstra met with the chief executive officer of Cal Dairies and offered to take his over-allocation milk elsewhere. The chief executive officer told him that he could not because the contract required him to deliver all of his milk to Cal Dairies and if he took any milk elsewhere there would be a penalty of 25 percent of the value of that milk owed to Cal Dairies. Scheenstra also asked if he could take all of his milk elsewhere. Again, he was told that he could not and that he could terminate the agreement only by notice before his membership anniversary date and the agreement would continue until a year from that anniversary date. Scheenstra gave such notice and his "out" date was December 2010.

Scheenstra considered buying "base" from members who received an allocation in excess of their actual production, but made a reasoned business judgment that it was not cost effective and would not in fact mitigate his losses.

As a result of the supply management program, Scheenstra (1) did not take his dairy up to the full designed capacity of 4,100 milking cows; (2) did not proceed with his planned third milking;[5] and (3) did not replace his culls, which reduced his milking herd. Despite these efforts, Scheenstra incurred penalties of $368,312.76 on the "overproduction" delivered from April 2008 through May 2009. Cal Dairies deducted the penalties from Scheenstra's milk payments.

After exhausting all available remedies with Cal Dairies, Scheenstra brought this lawsuit.

---

[5] Scheenstra contended that milking the cows three times a day instead of two would have yielded 14 percent more milk per day.

## PROCEEDINGS

In January 2009, Scheenstra filed a complaint for breach of a written contract, breach of the covenant of good faith and fair dealing, and negligent misrepresentation.

A court trial was held in January 2010 and the trial court issued a tentative decision on February 2, 2010. The court found that there was no misrepresentation and, thus, rejected Scheenstra's negligent misrepresentation claim. The court ruled that the causes of action for breach of contract and for breach of the covenant of good faith and fair dealing presented a single breach of contract issue, with only contract remedies available. After analyzing the terms of the contract and facts of the case, the trial court concluded that Cal Dairies "breached its contractual obligation to implement any supply management program equitably, uniformly, and based upon representative years of production."

With respect to damages, the trial court concluded that the correct measure was "the difference between the money [Scheenstra] received under the improper formula, and what he would have received under a proper uniform, equitable plan." The court directed the parties to submit posttrial briefs addressing how the proper amount of damages should be ascertained and stating their position as to what that amount should be.[6]

On February 24, 2011, the trial court issued its statement of decision, which incorporated its tentative decision from the previous February and set forth the trial court's determination of damages and interest.

The first step in the court's damages calculation concerned Cal Dairies's handling capacity. The court found that, as of March 25, 2008, Cal Dairies's milk handling capacity was 49,630,000 pounds per day.

The second step concerned a representative production number for Cal Dairies as a whole. This aggregate production number would be compared to Cal Dairies's handling capacity to determine the percentage of reduction needed to bring production down to the level where Cal Dairies could handle

---

[6] In March 2010, the parties filed posttrial briefs as well as reply briefs. In April 2010, the trial court sent the attorneys a letter stating that (1) neither party had addressed how damages would be ascertained based on the court's findings; (2) Scheenstra merely had reasserted his previous theories that had not been adopted by the court; and (3) the court would give Scheenstra another opportunity to address the court's original request regarding damages.

In December 2010, the trial court issued an order stating that the parties' responses to the court's letter did not comply with the directions given. Thus, the court provided the parties with further directions regarding the calculation of damages.

it all. For example, if the production number was 51,000,000 pounds per day, that number would be divided by the handling capacity of 49,630,000 pounds per day, which would equal 102.76 percent. In this example, a 2.76 percent reduction across Cal Dairies's membership would bring production in line with capacity.

The calculation of this aggregate production number is one of the main disputes regarding the calculation of damages.

The trial court started with the number Cal Dairies determined was the average daily member production for all of 2007, which was 47,858,498 pounds per day. Cal Dairies adjusted that number upward by annualizing for partial-year members and then adjusted it downward for dairies inactive at yearend. The adjusted figure was 48,272,996 pounds per day.

The trial court accepted each of these figures, but concluded that Cal Dairies should have made further upward adjustments for "dairies with previously planned and [Cal Dairies] allowed expansion" and should have annualized a figure for those dairies "based on projected near term production . . . ."[7] The court concluded that these further adjustments should have been added to Cal Dairies's adjusted number of 48,272,996 pounds per day to get a proper production amount.

When these posttrial calculations were being argued before the trial court, it was in Cal Dairies's interest to argue for as large an upward production adjustment as possible, because a larger upward adjustment of production would increase the amount of excess production and would, in turn, indicate that aggregate production (including Scheenstra's) needed to be reduced more to bring aggregate production into line with Cal Dairies's capacity. To achieve the greater reduction in production, lower quotas would need to be assigned. Cal Dairies would benefit from the court's assigning Scheenstra a smaller quota in its calculation of damages, because that lower quota would lead to a smaller award of damages.

---

[7] The trial court's determination that such an adjustment was necessary includes an implied finding that it was not fair to place all the risk of the decision to increase production on dairies that had planned to increase production *with Cal Dairies's approval* before the oversupply problem became known. In other words, the cooperative sought to benefit from the increased supply and the expanding dairy relied on the cooperative's willingness to take that extra production. In those circumstances, it would be unfair for the cooperative to benefit if things went well and share none of the detriment if market conditions became less favorable. In short, it was unfair for the cooperative to admit expanding dairies and then use them as a buffer against a subsequent oversupply problem.

Cal Dairies's relatively simple argument regarding fairness—that each member should bear the risk of the decision to expand—is contrary to the trial court's implied findings.

Accordingly, referring to the hardship appeal letters, Cal Dairies suggested an 8.2-million-pound upward adjustment for previously planned and allowed expansion. The court rejected this number, concluding it was an unreliable indicator of the previously planned and Cal Dairies's allowed expansion because (1) some letters did not specify the amount of adjustment requested, (2) staff thought the requests were not reliable indicators of need, and (3) using that figure would have resulted in an aggregate production number that exceeded handling capacity by 10 to 11 percent, which was unreasonably high.

The court also considered a survey done at Cal Dairies's request that estimated about 3.5 million pounds of anticipated additional production resulting from new dairies approved for membership and existing members increasing their herds.

Also, a staff writeup of the hardship appeals stated that about 32 percent of the requests cited new or ongoing expansion and that such requests amounted to 2.7 million pounds. The staff writeup also indicated that 4 percent of the requests were for dairies not yet producing and these requests totaled 1.8 million pounds.

The court concluded the 2.7-million-pound figure was the most reliable for projected production levels of members with already expanding production. As a result, the court added the 2.7 million pounds to Cal Dairies's 2007 adjusted average of 48,272,996 pounds, which generated a total of 50,972,996 pounds.[8] Comparing this figure to the capacity of 49,630,000 pounds, the court determined Cal Dairies would be over its capacity by 1,342,996 pounds, which meant that the projected production had to be cut by 2.6 percent to bring it into balance with Cal Dairies's capacity.

The next steps in the court's damages analysis were to (1) determine a production figure for Scheenstra, (2) determine what his base allocation would have been by reducing that production figure by 2.6 percent, and (3) calculate what Scheenstra would have been paid for the milk he delivered if that base had been used instead of the 252,000-pound base applied to him by Cal Dairies.

The trial court found that 290,000 pounds per day should have been used as Scheenstra's production figure. It also found that reducing the 290,000-pound figure by 2.6 percent would have provided Scheenstra with a "base" of 282,460 pounds, which was an equitable and uniform base allocation.

---

[8] The court also considered whether to make a downward adjustment (an adjustment that would have been unfavorable to Cal Dairies) for the declining production of some dairies. The court concluded the evidence was insufficient to quantify such a reduction.

To determine what Scheenstra would have been paid if that base had been used, the trial court relied on a spreadsheet Scheenstra submitted that included damages calculations using a base of 282,194 pounds per day. The spreadsheet indicated the difference in payments between this hypothetical base and the base assigned to Scheenstra by Cal Dairies was $324,116.30. Because the hypothetical base used in the spreadsheet was slightly lower than the court's own calculation of what Scheenstra's base should have been, the court concluded that $325,000 was a reasonable damage award.

In addition, the trial court exercised its discretion and awarded interest as additional damages at the rate of 10 percent per year from the date of the filing of the complaint, January 15, 2009.

On April 13, 2011, the trial court filed a judgment. The judgment stated that the $325,000 in damages consisted of various amounts for months beginning with April 2008 and ending with June 2009.[9] The judgment also stated the interest award, as of April 15, 2011, was $67,640.49, which produced a total damage award of $392,640.49.

In June 2011, Cal Dairies filed a notice of appeal. Scheenstra filed a notice of cross-appeal.

## DISCUSSION

This appeal concerns the breach of contract cause of action on which Scheenstra prevailed at trial. Article VII of the Bylaws is entitled "MARKET-ING AGREEMENT" and section 7.1 of the Bylaws states that article VII and certain other documents express the terms of the marketing agreement between each member and the association. Based on these provisions, the parties agree that the Bylaws created a contract between them. Their dispute concerns whether Cal Dairies's supply management program (i.e., its production quota system) violated section 7.3 of the Bylaws. That provision obligated Cal Dairies to accept all of the milk of its members, "subject to the right of the Board, in its discretion, upon written notice to the membership . . . to allocate equitably among the members on a uniform basis . . . the quantity . . . of milk to be received by the Association."

### I. Business Judgment and the Rule of Judicial Deference

#### A. Contentions of the Parties

Cal Dairies challenges the trial court's breach of contract determination by asserting that the dispositive issue is a legal one—whether the trial court

---

[9] Cal Dairies's June payment to Scheenstra was for milk delivered in the month of May 2009, the last month that the supply management program was in effect.

erred when it failed to apply the business judgment rule and give deference to the board of directors's formulation of the supply management program. Cal Dairies contends that the California Supreme Court's decision in *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249 [87 Cal.Rptr.2d 237, 980 P.2d 940] (*Lamden*) is the controlling authority and compels us to conclude that the board of directors's decision is entitled to deference.

In response, Scheenstra presents a number of arguments for why the business judgment rule does not apply in this case. For example, Scheenstra argues that Cal Dairies failed to establish the factual prerequisites to the rule's application, including the absence of a conflict of interest and the exercise of discretion in good faith. (See *Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1045 [100 Cal.Rptr.3d 875] [exception to business judgment rule exists in circumstances that inherently raise an inference of a conflict of interest].)

### B. Lamden *and the Business Judgment Rule*

In *Lamden, supra,* 21 Cal.4th 249, the owner of a condominium unit sought injunctive and declaratory relief against the development's unincorporated homeowners association because the association elected to spot treat a termite infestation in the building containing her unit rather than fumigate the entire building. The trial court applied what it called a "business judgment test," found the homeowners association had a rational basis for its decision to reject fumigation, and entered judgment for the association. (*Id.* at p. 256.) The Court of Appeal reversed, concluding that the trial court should have applied an objective standard of reasonableness to the homeowners association's decision. (*Ibid.*) The California Supreme Court reversed the Court of Appeal, concluding the trial court correctly deferred to the decision of the board of the homeowners association. (*Id.* at p. 265.)

In *Lamden,* the Supreme Court addressed the homeowners association's contention that the business judgment rule applied to its maintenance decision. (*Lamden, supra,* 21 Cal.4th at p. 257.) The court stated that, strictly speaking, California's version of the business judgment rule applied to corporate entities and did not protect noncorporate entities. (*Id.* at p. 259.) Because the homeowners association was not incorporated, the court concluded that the business judgment rule and its deference to corporate decisionmaking had no direct application to the case. (*Id.* at p. 260.)

The court then considered whether to adopt an analogous rule of *judicial deference* for community association boards, regardless of the association's corporate status. The court concluded such a rule was appropriate and

formulated the following rule of judicial deference: "Where a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise." (*Lamden, supra,* 21 Cal.4th at p. 253.)

Based on the discussion of the business judgment rule in *Lamden,* we conclude that Cal Dairies can seek the protection of the business judgment rule only if it is incorporated.

Cal Dairies's articles of incorporation state that it is organized as a nonprofit cooperative association and also state it "is a membership corporation without capital stock." (See Food & Agri. Code, § 54002 ["association" defined as any corporation organized under the chapter addressing nonprofit cooperative associations].) Because Cal Dairies is organized as a corporation, we conclude that any deference that we might give its board of directors's decisionmaking in this breach of contract lawsuit will be derived from California's business judgment rule, rather than an analogous rule of judicial deference of the type established for homeowner associations in *Lamden, supra,* 21 Cal.4th 249.[10]

### C. *Application of the Business Judgment Rule*

■ California's business judgment rule has two parts. The first part is statutory and immunizes corporate directors from personal liability if they act in accordance with certain conditions. (See Corp. Code, §§ 309 [profit corporations], 7231 [nonprofit corporations].)[11] This lawsuit does not attempt

---

[10] The business judgment rule and its exceptions have been applied to dairy cooperatives in other contexts. (See *Lopes v. Vieira* (E.D.Cal. 2007) 488 F.Supp.2d 1000 [members of a dairy cooperative filed derivative lawsuit; court applied business judgment rule and related requirement that demand be submitted to directors as a condition to maintaining a derivative action]; *Parish v. Maryland & Virginia Milk Producers Assn.* (1968) 250 Md. 24 [242 A.2d 512] [order sustaining demurrer reversed, complaint's allegations were sufficient to indicate the board's actions were the result of gross negligence and culpable mismanagement and thus came within an exception to the business judgment rule]; see also *Great Rivers Co-op of Southeastern Iowa v. Farmland Industries, Inc.* (8th Cir. 1999) 198 F.3d 685 [court applied business judgment rule to incorporated agricultural cooperative; the plaintiffs failed to present sufficient evidence to overcome the business judgment rule].)

[11] The conditions that must be satisfied to obtain the personal immunity include performing "the duties of a director . . . in good faith, in a manner such director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." (Corp. Code, § 7231, subd. (a).)

to impose personal liability on the directors of Cal Dairies. Therefore, the first part of the business judgment rule has no application in this case.

The second part of the business judgment rule is based on the common law and insulates from court intervention those management decisions made by directors in good faith in what the directors believe is the organization's best interest. (*Berg & Berg Enterprises, LLC v. Boyle, supra,* 178 Cal.App.4th at p. 1045.) The premise of the business judgment rule is that directors, not the courts, are best able to judge whether a particular act or transaction is helpful to the conduct of the organization's affairs or expedient for the attainment of its purposes. (*Ibid.*) Thus, "when the rule's requirements are met, a court will not substitute its judgment for that of the corporation's board of directors. [Citation.]" (*Lamden, supra,* 21 Cal.4th at p. 257.)

A common situation where the second part of the business judgment rule might apply is where a minority shareholder brings a shareholder derivative action against the corporation and third party, contending that the corporation should have pursued litigation against that third party. (E.g., *Reilly v. Greenwald & Hoffman, LLP* (2011) 196 Cal.App.4th 891 [127 Cal.Rptr.3d 317] [shareholder derivative action against the corporation's outside counsel].) Generally, the business judgment rule applies to a board of directors's decision not to pursue litigation and, therefore, a shareholder may not institute a derivative action where the board of directors, acting in good faith and in the reasonable exercise of its business judgment, refused to pursue the lawsuit. (*Country National Bank v. Mayer* (E.D.Cal. 1992) 788 F.Supp. 1136, 1144.)

In this case, the application of the business judgment rule is not as straightforward as the situation where a board makes a management decision not to file a lawsuit. Here, the management decision—establishing the terms of the supply management program—is also subject to the terms of the contract between Scheenstra and Cal Dairies. Thus, the board's decision implicated both its management responsibilities and Cal Dairies's obligation to perform as agreed in its contracts with Scheenstra and the other dairies. The dual nature of the board's management decision/performance of a contractual obligation presents the following question: What role, if any, does the business judgment rule have in determining whether a contractual obligation is breached?

A case that provides some guidance on this issue is *Hill v. State Farm Mutual Automobile Ins. Co.* (2008) 166 Cal.App.4th 1438, 1473–1474 [83 Cal.Rptr.3d 651], which involved the application of Illinois law. In that case, policyholders brought a class action against an automobile insurer, which was organized as a mutual insurance company, alleging it breached a duty to pay

dividends to the policyholders. The company's policies and bylaws obligated its board to consider whether to declare dividends from time to time. (*Id.* at p. 1473.) The appellate court stated that (1) this obligation to consider declaring dividends imposed a duty of care upon the board and (2) the business judgment rule was a defense to the alleged breach of this duty. (*Ibid.*) The court explicitly addressed "cases holding that the business judgment rule does not apply to a breach of contract claim" and concluded those cases were inapplicable. (*Ibid.*) The court based its conclusion on the ground that in those cases, "the board was not vested with any discretion in making the challenged decision." (*Id.* at p. 1474.)

The class action in *Hill v. State Farm Mutual Automobile Ins. Co., supra,* 166 Cal.App.4th 1438, also generated two earlier appellate decisions. In the first writ proceeding *State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434 [8 Cal.Rptr.3d 56], the appellate court addressed the plaintiffs' argument that "their right to dividends should be adjudicated under contract law, the business judgment rule notwithstanding." (*State Farm Mutual Automobile Ins. Co. v. Superior Court, supra,* 114 Cal.App.4th at p. 446.) The court rejected this argument, stating that the business judgment rule was reflected in the language of the insurance company's policies, newsletter and bylaws and, therefore, the rule was, "in essence, written into the contract." (*Ibid.*) The court also determined that the decision whether to declare a dividend was a matter of internal corporate governance and, therefore, the internal affairs doctrine required that liability related to that decision be determined under the law of the insurance company's place of incorporation, Illinois. (*Id.* at pp. 446–449; see *Lidow v. Superior Court* (2012) 206 Cal.App.4th 351, 363 [141 Cal.Rptr.3d 729] [voting rights of shareholders, payment of dividends to shareholders, and procedural requirements of shareholder derivative suits involve matters of internal corporate governance].)

■ Here, the contract (1) granted discretion to Cal Dairies's board on a matter involving business operations, not a matter involving internal corporate governance, and (2) limited that discretion by requiring the board to allocate milk quantities equitably among members on a uniform basis. In a situation where a contract grants a board limited discretion, we conclude that the board's decision is not scrutinized under the business judgment rule (i.e., afforded the deference inherent in that rule) until after the court determines that the action of the board falls with the discretionary range of action authorized by the contract. Just as a trial court's discretionary authority is limited by the legal principles it is applying (*Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365]), Cal Dairies's board's discretionary authority under a contract is limited by the terms of that contract. Once it has been determined that the board's action falls within the range of the discretionary

authority granted by the contract, then the board's exercise of that discretionary authority would be reviewed under the business judgment rule.[12]

Our conclusions regarding the role of the business judgment rule in this breach of contract action can be restated in the following terms. A contractual grant of discretion does not empower a board of directors to go outside the range of actions authorized by the contract. The business judgment rule does not allow a board of directors to rewrite a contract to expand its own discretionary authority and diminish the contractual rights and protections given the other party.

Thus, a critical question in this appeal regarding the business judgment rule is whether the board of directors acted within, or in excess of, its discretionary authority to adopt an equitable, uniform supply management program. This question involves the interpretation of the contract to determine the scope of the discretion granted to the board[13] and the application of that interpretation to the facts of this case. Our interpretation and application of that interpretation will be guided by established principles of contract law.

## II. Appellate Review of Contract Determinations

Under California law, the steps a trial court must follow in determining the meaning of a contract are well established, as are the applicable standards of appellate review.

### A. Ambiguity in the Contract

■ The threshold question is whether the contract is ambiguous—that is, reasonably susceptible to more than one interpretation. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].) The question of ambiguity is a question of law subject to independent review on appeal. (*Ibid.*)

---

[12] This review would include addressing whether other prerequisites for the business judgment rule's application were met and whether any exception to the rule might apply. For example, the deference provided by the business judgment rule would not apply if the circumstances inherently raise an inference of a conflict of interest. (*Berg & Berg Enterprises, LLC v. Boyle, supra*, 178 Cal.App.4th at p. 1045.) "The business judgment rule does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest." (*Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 430 [8 Cal.Rptr.3d 31].) In this appeal, we do not reach the question whether the circumstances inherently raise an inference that the board had a conflict of interest in making decisions about the quota system that would apply to all members.

[13] This inquiry into the scope of the discretion established by the contract parallels an inquiry required by the rule of judicial deference established in *Lamden*. There, the Supreme Court indicated that the decision of a homeowners association board is entitled to deference only if, among other things, the board "exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions . . . ." (*Lamden, supra*, 21 Cal.4th at p. 253.)

The analysis of ambiguity is not necessarily limited to the words of the contract. Trial courts are required to receive provisionally any proffered extrinsic evidence that is relevant to show whether the contractual language is reasonably susceptible to a particular meaning. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40 [69 Cal.Rptr. 561, 442 P.2d 641].) Such extrinsic evidence might expose a latent ambiguity when the contract appears unambiguous on its face. (*Id.* at p. 40 & fn. 8.)

## B.   *Resolution of an Ambiguity*

■   If the court determines there is no ambiguity—that is, the language is reasonably susceptible to only one interpretation—then the judicial inquiry into meaning is finished and the clear and explicit meaning governs. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; Civ. Code, § 1638.) When no ambiguity exists, the last step for the court is to apply that clear meaning to the facts of the case.

Here, the contract contains ambiguities and, therefore, our inquiry into the meaning of the contract must continue and resolve those ambiguities. When a contractual ambiguity exists, the appellate court must determine whether the parties have presented conflicting extrinsic evidence relevant to the meaning of the ambiguous language before it can proceed.

If no extrinsic evidence was presented or if the extrinsic evidence was not in conflict, the resolution of the ambiguity is a question of law, which is subject to independent review on appeal. (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 [8 Cal.Rptr.3d 649].) Even where uncontroverted evidence allows for conflicting inferences to be drawn, our Supreme Court treats the interpretation of the written contract as solely a judicial function. (E.g., *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527 [117 Cal.Rptr.2d 220, 41 P.3d 46]; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) In this case, either no extrinsic evidence was presented regarding a particular ambiguity or any relevant extrinsic evidence was not in conflict. Therefore, we will resolve the ambiguities in the parties' contract by employing an independent standard of review.[14]

## C.   *Application of Interpretation to the Facts of the Case*

■   The determination of the meaning of a writing, which can be described as interpretation or construction, can be treated as distinct from the

---

[14] In contrast, if the extrinsic evidence had been in conflict, the trial court would have been required to resolve that conflict by making findings of fact and, as a result, the ultimate interpretation of the ambiguous language would have been treated as a question of fact. (*Wolf v. Superior Court, supra,* 114 Cal.App.4th at p. 1351.) In such a situation, appellate courts will uphold any reasonable construction by the trial court "as long as it is supported by substantial evidence. [Citation.]" (*Winet v. Price, supra,* 4 Cal.App.4th at p. 1166.)

application of that meaning to the facts presented. (See *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 754, fn. 17 [106 Cal.Rptr.3d 318] [*"application* of a provision to a particular fact pattern is different than *determining the meaning* of a particular term"].) Therefore, we also address the standard of review that governs the application of an interpretation to the facts of a case.

"Absent a factual dispute, the interpretation of an insurance contract and its application to undisputed facts are questions of law that we review de novo. [Citation.]" (*Westrec Marina Management, Inc. v. Arrowood Indemnity Co.* (2008) 163 Cal.App.4th 1387, 1391 [78 Cal.Rptr.3d 264].) A similar rule applies where the writing in question is a statute: "Issues of statutory construction as well as the application of that construction to a particular set of facts are questions of law." (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492 [35 Cal.Rptr.3d 596].)

Based on the foregoing, we conclude that the application of our interpretation of the contract between Scheenstra and Cal Dairies to the facts of this case is subject to our independent review, provided that the relevant facts are not in dispute.[15]

### III. *Meaning and Application of Section 7.3 of the Bylaws*

#### A. *Contractual Language*

Section 7.3 of the Bylaws obligated Cal Dairies to accept all of the milk of its members, "subject to the right of the Board, *in its discretion*, upon written notice to the membership, or member, as may be required, to allocate *equitably* among the members on a *uniform basis*, for any day, week or other appropriate period, the quantity and, if necessary, the grade or quality of milk to be received by the Association." (Italics added.)

Section 7.3 of the Bylaws also provides: "In determining each member's pro-rata share of net proceeds, the Association shall take into account and treat as lesser value milk delivered by the member in excess of the member's internal production quota assigned by the Association *based upon the member's historical production over a representative period of years*, if the Association, in its discretion, has implemented an internal production quota

---

[15] Conversely, when the facts to which a contract provision must be applied are disputed or require the weighing of evidence, the application of that provision presents a question of fact. (See *Alpine Ins. Co. v. Planchon* (1999) 72 Cal.App.4th 1316, 1324 [85 Cal.Rptr.2d 777] [court rejected de novo review for application of interpretation of policy; substantial evidence supported trial court's finding that defendant's pickup was mobile equipment covered by the policy].)

system." (Italics added.) The Bylaws are silent about how to determine the quota, if any, of members who do not have production "over a representative period of years."

### B.  *Trial Court's Finding of Breach*

The trial court summarized the pertinent requirements of section 7.3 of the Bylaws by stating that if Cal Dairies decided to implement an internal production quota system, "it must '. . . allocate equitably among members on a uniform basis . . . the quantity . . . of milk to be received by the association.' Furthermore, such allocation should be '. . . based upon the member's historical production over a representative period of years.' "

The trial court ultimately found that Cal Dairies "breached its contractual obligation to implement any supply management program equitably, uniformly, and based upon representative years of production." In explaining this finding, the trial court stated:

"Obviously, no formula could be perfectly fair and uniform. There would always be some who would feel any formula was more detrimental to them than others. There is a decent sized window for 'equitable' and 'uniform'. However, a program which creates a (relatively large) class of losers in order to keep others from having to cut even a little is on its face not equitable, and certainly not uniform.

"The clear intent of Section 7.3 is that if market forces necessitated a reduction in [Cal Dairies's] capacity to accept all milk from its members, then everyone would feel the pain equally and uniformly."

We note that in reaching its determination that Cal Dairies breached the contract, the trial court did not set forth the usual steps of contractual analysis. Specifically, the court did not state (1) whether the terms "equitably" and "uniform" were ambiguous; (2) whether the parties presented extrinsic evidence regarding the meaning of those and other terms in section 7.3 of the Bylaws and, if so, whether that evidence was conflicting; and (3) which definition or meaning it would adopt for the ambiguous terms, if any. Instead, the trial court treated the word "equitably" as meaning fair and proceeded directly to the application of the contract provisions to the facts of the case.

The trial court took this approach because of the way the parties presented the case. Neither Scheenstra's nor Cal Dairies's trial brief explicitly addressed whether the terms in section 7.3 of the Bylaws were ambiguous and argued why those terms were reasonably susceptible to a particular definition

or meaning. Instead of addressing the questions of ambiguity and interpretation, the parties went directly to the last step of the contractual analysis and argued about how the requirements of section 7.3 should be *applied* to the facts presented.

## C.   *Contentions of the Parties on Appeal*

Cal Dairies contends that its supply management program complied with the terms of the contract as written. As to appellate review of the breach of contract determination, Cal Dairies contends that because extrinsic evidence regarding the meaning of section 7.3 of the Bylaws was not presented to the trial court, we must make an independent determination as to the meaning of that provision.[16] (See *Parsons v. Bristol Development Co., supra*, 62 Cal.2d at p. 865 [interpretation of written instrument when there is no extrinsic evidence is essentially a judicial function].) Cal Dairies further contends that if we determine the trial court's interpretation of "equitably" and "uniform" was erroneous, the trial court's judgment must be reversed.

Scheenstra responds by asserting that Cal Dairies's argument regarding the standard of review is overstated and erroneous. In Scheenstra's view, the trial court was not interpreting an ambiguous agreement, but simply took the language in section 7.3 of the Bylaws and applied it to the facts and evidence presented. Thus, the trial court simply applied the provisions of the Bylaws "to the facts at hand and found, based upon the evidence presented, that the Board's program was not allocated equitably or on a uniform basis because the Board designed such program to have a large class of winners (those with level production and those with descending production), and losers . . . ."

---

[16] We agree an independent standard of review applies and note that Cal Dairies has not argued this court should defer to the board's determination of the *meaning* of the Bylaws. Had Cal Dairies presented such an argument, it is unlikely that argument would have prevailed. First, California follows the rule that corporate bylaws are construed under the general rules governing construction of statutes and contracts. (*Singh v. Singh* (2004) 114 Cal.App.4th 1264, 1294 [9 Cal.Rptr.3d 4]; 9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 73, p. 844 [construction of bylaws].) Here, the Bylaws made no attempt to alter the rules of judicial review and contract interpretation by expressly empowering the board of directors to decide the meaning of ambiguous provisions in the Bylaws. Second, it has been recognized that the interpretation given a bylaw by a board of directors is not controlling in a dispute between a shareholder and the corporation. (8 Fletcher, Cyclopedia of the Law of Private Corporations (2012) § 4195; see *Smith v. Adventist Health System/West, supra*, 182 Cal.App.4th at pp. 751–754 [this court did not defer to hospital staff's interpretation of the staff bylaws].) Third, courts generally are responsible for protecting the parties' objectively reasonable expectations under a contract by determining the objective meaning of the contract's language. (See *Bank of the West v. Superior Court, supra*, 2 Cal.4th at p. 1265 [rule of contract law in Civ. Code, § 1649 protects the objectively reasonable expectations of the promisee].) Deferring to a board's determination of the meaning of an ambiguous provision in a contract would undermine the reasonable expectations of the other party and would create an incentive for the board to draft ambiguous contracts.

Thus, Scheenstra argues (1) the trial court made findings of fact that the supply management program was not equitable and uniform and (2) these findings are not subject to independent review, but are reviewed under the substantial evidence standard.

### D. *Ambiguity and Meaning*

An appellate analysis of the threshold question concerning whether the contractual language is ambiguous—that is, reasonably susceptible to more than one interpretation—usually involves the examination of competing interpretations offered by the parties.

Here, Cal Dairies's opening appellate brief refers to the definitions of "equitable" and "uniform" contained in Webster's Third New International Dictionary. Scheenstra has not presented a competing interpretation of these words. Instead, he argued that the "trial court was not attempting to interpret an ambiguous agreement . . . ."

In view of the positions taken by the parties, we conclude that the term "equitably" as used in section 7.3 of the Bylaws is not ambiguous. Webster's Third New International Dictionary (1993) defines "equitably" to mean "in an equitable manner." (*Id.* at p. 769, col. 1.) It defines "equitable" to mean "characterized by equity : fair to all concerned . . . : without prejudice, favor, or rigor entailing undue hardship . . . ." (*Ibid.*) Thus, we conclude that "equitably" means in a manner fair to all without prejudice, favor or rigor entailing undue hardship.[17]

In contrast, we conclude that the term "uniform" is ambiguous because the dictionary definitions indicate that it can have a strict or flexible meaning. For example, Black's Law Dictionary (9th ed. 2009) provides the following definitions of "uniform": "Characterized by a lack of variation; identical or consistent." (*Id.* at p. 1668, col. 1.) Webster's Third New International Dictionary, defines "uniform" as "marked by complete conformity to a rule or pattern or by similarity in salient detail or practice : CONSONANT, ALIKE" and "consistent in conduct, character, or effect : lacking in variation, deviation, or unequal or dissimilar operation . . . ." (*Id.* at p. 2498, col. 3.) Terms like "identical" and "complete conformity" suggest a strict meaning of the word. In contrast, phrases like "similarity in salient detail or practice" and "consistent in . . . effect" suggest a less rigid meaning. As a result, the term "uniform" is ambiguous on its face.

The next step in the process is to select which meaning of the word "uniform" reflects how it was used in section 7.3 of the Bylaws. The facts

---

[17] The parties have not addressed whether the hardship committee's standard of "extreme hardship" is consistent with the "undue hardship" phrase used in this definition of "equitably."

that establish the context in which the word was used include the circumstances of each member's operations and the resulting production delivered to Cal Dairies. It is undisputed that the members' operations are not identical and differ in many respects, such as the number and age of the cows. Thus, a less rigid definition—one that allows some variation due to the circumstances—appears to be closer to what the parties intended. Therefore, we conclude that "uniform" means consistent in effect and similar in practice, rather than identical or marked by complete conformity.

### E. Application of Section 7.3 to Facts of This Case

Our application of the equitable and uniform requirements to the facts of this case is the last step in determining whether the supply management program adopted by Cal Dairies was within the range of discretionary options permitted by those criteria. Our conclusion that these terms granted a *range* of options is consistent with the statement by the trial court that these requirements could be satisfied by more than one formula for the base assigned to each member.

The trial court determined that the criteria were not met by the program because it created three different classes of members, with different effects on each class. The three classes were: "1) Those with mature herds and level production; 2) Those in the process of expanding, with increasing and not yet maximized production, and 3) Those with declining herds and decreasing production."

The trial court addressed the different effects on these classes by finding: "The board had determined that if it treated members uniformly, all but those with decreasing herds would have to cut production. So, instead, it created three categories, with the effect that it protected those with level or otherwise high 2007 production; it rewarded those with declining production (by created saleable base), and penalized Scheenstra and others with ascending production."

Based on our independent review, we agree with the trial court that the supply management program adopted by Cal Dairies was not fair and uniform and, therefore, the program did not fall within the discretionary range of options available to the board of directors.

Specifically, the program did not equitably allocate base to the members. "Equitably" means in a manner fair to all without favor or rigor entailing undue hardship. Here, the cooperative was faced with the problem of oversupply. It addressed this problem by putting some of its members in a better position than they would have been in if there had been no oversupply problem. The

saleable base given to members with declining production was a benefit they would not have had without the oversupply problem. It was clearly inequitable to allow them to *benefit* from the problem while other members shouldered the detriments created by the oversupply. This windfall or boon makes it relatively easy to conclude that the supply management program adopted by Cal Dairies was not equitable.

Furthermore, the fact that the supply management program created benefits for some members to the detriment of other members also leads to the conclusion that the program was not consistent in effect and, therefore, was not "uniform."

We need not proceed with a further analysis of the adjustment process implemented by the board to determine if that process corrected the lack of uniformity. The hardship committee did not have authority to take away the benefit of excess, saleable base given to some members.

In its opening brief, Cal Dairies asserts that the supply management program "applies the *same* criteria **uniformly** to all [Cal Dairies] members . . . ." This assertion misstates the facts of this case. The lack of uniformity is illustrated by, among other things, the process that allowed decisions by the committee to be appealed to Erba and Korsmeier, their recommendation that 11 dairies receive an increase in base totaling 75,990 pounds, and the board's approval of this recommendation. The standards applied by Erba and Korsmeier were not the standards applied to all members when the base allocation was made.

In summary, the trial court correctly found that Cal Dairies's supply management program breached its agreement with Scheenstra.

## IV. *Damages for the Breach of Contract*

After the trial court determined Cal Dairies breached the contract, the court proceeded to adopt and apply its interpretation of the contract as the initial step in calculating damages. As previously stated, the terms "equitably" and "uniform" provided a range of acceptable formulas for production quotas. In calculating the damages, the trial court was required to adopt a formula within the contractually established range, but was not required to adopt the exact formula that the board of Cal Dairies would have adopted if it had complied with the contract.

Cal Dairies argues the trial court's award of damages for the breach of contract cannot be upheld because the supply management program outlined by the trial court as a basis for calculating damages fails to comply with the

terms of the contract. In other words, Cal Dairies is contending that the trial court chose a formula outside the range established by the contract. We reject this contention.

### A. Interpretation Used by Trial Court to Calculate Damages

#### 1. Trial Court's Interpretation

The trial court ruled that the correct measure of damages was the difference between what Scheenstra actually received for milk deliveries made while the quota system was in effect, and what he would have received with a proper, uniform supply management program. The court identified what a proper supply management program would have entailed by setting forth the following formula: "[Cal Dairies] should have, at a minimum, made an adjustment for ascending and descending production dairies (to 'annualize' them, as they did for ones with only partial 2007 production), to fairly reflect a representative period, and then compare the member totals, as adjusted, to find what percent reduction would be necessary to reduce production to what [Cal Dairies] could accommodate, and thus fix the 'base' . . . ."

In applying this formula, the trial court determined that Scheenstra, as a dairy with ascending production, should have been treated as having a production level of 290,000 pounds per day. In addition, the court found that aggregate member production was 2.6 percent larger than Cal Dairies's handling capacity and, therefore, proper quotas should have been set 2.6 percent below the members' production levels. This 2.6 percent reduction to Scheenstra's 290,000 pound production level would have resulted in a base allocation of 282,460 pounds per day. This is the base allocation the trial court used in calculating Scheenstra's damages.

#### 2. Cal Dairies's Contentions

Cal Dairies argues that the trial court's interpretation and the resulting formula ignored the contractual requirement that the base allocation assigned the members should be "based upon the member's *historical production* over a representative period of *years* . . . ." (Italics added.) Cal Dairies contends that under the court's formula dairies with previously planned expansion (such as Scheenstra's) would receive an internal production quota that was an annualized figure derived from *projected* near-term production, not the member's historical production as expressly required by section 7.3 of the Bylaws.

Cal Dairies asserts that the parties offered no extrinsic evidence as to what "historical production" meant. Therefore, Cal Dairies argues the court should have adopted the common meaning of "historical," which is "based on,

resulting from, or acknowledged to be true because of past events or experiences."[18] The trial court's choice of 290,000 pounds per day as Scheenstra's production, in Cal Dairies's view, is not the historical production required by the express terms of the contract.

The trial court rejected Cal Dairies's reading of the clause regarding a production quota "based upon the member's historical production over a representative period of years" by stating:

"[Cal Dairies's] interpretation is belied by [its] own application of the language in setting the base here. It is clearly not possible to use multiple retro-years for new members and for partial year members. [Cal Dairies] recognized this and therefore adjusted and 'annualized' part year results, using projections, in order to make it 'representative.'

"It is also not possible to literally apply the phrase to newly expanding dairies, or new dairies just getting up to full production. [Cal Dairies] recognized this, and established a category, based on projected six month future production figures, and another for year end production figures.

"The Court agrees with the interpretation [Cal Dairies] used when applying it in 2007 and 2008, namely that the intent and effect (necessary to be usable at all) is to require determining a figure that fairly represents production over a period of time, as opposed to using a snapshot at any given time.

"As [Cal Dairies] recognized, if a dairy did not have an actual long term stable production figure, [Cal Dairies] would have to take steps to take available dat[a] and industry standards and construct a fair determination of production which can be projected as representative of a period of time. [Cal Dairies] did just that in 'annualizing' short term members, and projecting anticipated production for ascending members."

In short, Cal Dairies did not rely on solely a "representative period of years" in calculating the internal production quotas. Cal Dairies's calculations began using the production from only one year—2007. Also, it annualized production for dairies that were members for only part of 2007. Thus, the trial court was not impressed by Cal Dairies's argument about how the court should apply the "period of years" language because Cal Dairies had not followed that interpretation and used multiple years. Similarly, because Cal Dairies had made forward-looking adjustments, the trial court was not convinced by the argument that the term "historical production" absolutely prohibited adjustments based on projections of future production.

---

[18] Webster's Third New International Dictionary, *supra*, at page 1073, column 2.

### 3. *Meaning of "Representative Period of Years"*

The language in the clause regarding a production quota "based upon the member's historical production over a representative period of years" can be broken down for analysis in several ways. We will begin by addressing the phrase "over a representative period of years."

Two words in the phrase are of particular interest to our inquiry into meaning. First, the word "years" is plural. Ordinarily, parties use a plural word when they mean more than one. (See *Scott v. Sun-Maid Raisin Growers Assn.* (1936) 13 Cal.App.2d 353, 357 [57 P.2d 148] [use of plural in a contract was persuasive that parties contemplated more than one]; *Silvio v. Ford Motor Co.* (2003) 109 Cal.App.4th 1205, 1208–1209 [135 Cal.Rptr.2d 846] [use of plural in statutory requirement presumed to mean make more than one; a single attempt did not meet statutory requirement for a reasonable number of repair attempts].) Therefore, we conclude that the ordinary meaning of "period of years" is a period of time covering more than one year.

Second, the word "representative," like the prepositional phrase "of years," modified the term "period." The parties have not briefed the meaning of "representative," but a dictionary defines it as "serving as a characteristic example" and being synonymous with "typical." (Webster's 3d New Internat. Dict., *supra*, at p. 1926, col. 3.) We will use this definition of "representative" in addressing how to apply the phrase "over a representative period of years" to the historical production of member dairies.

During the period that the internal production quota system was in effect, not all of Cal Dairies's members had been in production for more than one year. Also, the production from dairies operating for more than one year might not be regarded as representative where that production included the operation's startup or an unusual interruption of production. The practical question generated is how to apply the contractual language to dairies that had not been members for a "period of years" or otherwise lacked production from a *"representative* period." The Bylaws do not provide an explicit answer. Thus, an answer must be inferred.

One possible inference is that the Bylaws intended such dairies to be assigned an internal production quota of zero because those dairies lacked either multiple years of production or a period that was representative of their production. Alternatively, one could infer that the Bylaws intended the board to make adjustments for member dairies that did not have production "over a representative period of years."

When Cal Dairies adopted the internal production quotas, it impliedly resolved this ambiguity in the Bylaws because it chose to make adjustments.

Similarly, the trial court concluded that the proper interpretation was to infer that adjustments should be made for dairies without production from "a representative period of years."

In conducting our independent review, we first conclude that the Bylaws are ambiguous about what should be done when a member dairy does not have production from "a representative period of years."

Next, we conclude that the proper resolution of the ambiguity is to make adjustments for such dairies. The alternative interpretation—concluding that those dairies do not qualify for an internal production quota—is inappropriate in the circumstances presented. Among other things, such an interpretation would create disharmony with the requirement that internal production quotas be allocated equitably among the members. To be equitable, the allocation must be fair to all members[19]; assigning some members an internal production quota of zero because their dairies lacked production over a representative period of years would be unfair to those members. Also, such an interpretation would not protect the objectively reasonable expectations of the dairies. Not being eligible for an internal production quota could be an economic death sentence for a dairy required to deliver all of its milk production to Cal Dairies. It is not objectively reasonable to infer such a severe consequence—an objectively reasonable person would expect such a consequence to be made explicit.

Therefore, the trial court did not err when it concluded that (1) the contractual language concerning production from "a representative period of years" did not prevent Scheenstra from obtaining an internal production quota and (2) adjustments to Scheenstra's past production would be necessary to generate that quota.

### 4. *Meaning of "Based Upon" and "Historical Production."*

The next part of the clause regarding a production quota "based upon the member's historical production over a representative period of years" that we will address are the terms "based upon" and "historical production."

We will accept, for purposes of this appeal, Cal Dairies's position that "historical production" refers to actual production from the past. Consequently, our discussion is focused on whether the term "based upon" is ambiguous and, if so, what meaning it should be given.

The verb "base" means "to use as a base or basis for: ESTABLISH, FOUND—used with *on* or *upon* . . . ." (Webster's 3d New Internat. Dict.,

---

[19] Webster's Third New International Dictionary defines "equitable" to mean "fair to all concerned . . . ." (*Id.* at p. 769, col. 1.)

*supra*, at p. 180, col. 3.) The term also "applies to what underlies a belief [or] . . . judgment . . . ." (*Id.* at p. 181, col. 1.) Because the word "basis" is used in the definition of the verb "base," we note that the relevant definition of "basis" is "the principal component of anything : fundamental ingredient . . . ." (*Id.* at p. 182, col. 3.)

Under these definitions, the phrase "based upon" ordinarily does not mean the thing referred to as the base or basis is the *exclusive or sole* component. (See Code Civ. Proc., § 1861 ["terms of a writing are presumed to have been used in their primary and general acceptation"]; see also *Gibbons v. Ogden* (1824) 22 U.S. (9 Wheat.) 1, 188 [6 L.Ed. 23].) Consequently, we conclude that the phrase is not ambiguous in this regard—a quota can be "based upon" historical production even if the quota takes into account (i.e., makes an adjustment for) other information. In other words, we conclude that the phrase "based upon" is not reasonably susceptible to an interpretation that makes "historical production" the *exclusive* factor in calculating the quota. If the drafter had intended the quota to be based upon historical production *only*, then the drafter should have included an additional word or words indicating such a restriction.

Furthermore, when information about historical production is collected and examined, it contains more data than just the amount of production for a particular unit of time. The data also will reveal changes in the rate of production. Here, the monthly settlement statements that Cal Dairies issued to Scheenstra for the Wasco dairy showed its monthly production and, when considered together, showed the production was increasing. The trial court found that Scheenstra "had an anticipated (per board minutes) production of 290,000 and an actual as of December 2007 . . . of 261,764 pounds, with an upward curve." When this raw data about production levels and rates of increase are combined with knowledge of the dairy business and the production life of milk cows, it was possible to make reasonable projections about future production levels. In this case, the trial court's projection of Scheenstra's production at 290,000 pounds per month was made using information about his historical production data.[20] Therefore, the trial court's projection meets the contractual requirement of being "based upon the member's historical production over a representative period . . . ."

In summary, we conclude that the trial court did not violate the provision in section 7.3 of the Bylaws stating that the internal production quota was to be "based upon the member's historical production over a representative

---

[20] This data was not the only evidence relied upon by the court, which also took into consideration the anticipated production figure noted as "[p]lus 290,000 lbs." in the board's December 2006 minutes.

period of years" when it found that a "base" of 282,460 pounds for Scheenstra would be equitable and uniform.

### B. *Substantial Evidence Supports the Trial Court's Damage Calculation*

Cal Dairies recognizes the deferential nature of the substantial evidence standard of review and argues that this case "is one of those rare instances where there was insufficient evidence to support the trial court's damages award."

Specifically, Cal Dairies argues that the trial court needed the following information to make an appropriate damages calculation: (1) The projected near term production of dairies with previously planned and Cal Dairies's allowed expansion; (2) the amount of unused base of dairies with declining production after 2007; and (3) the penalties that the production from Scheenstra's Tipton dairy would have incurred under the trial court's quota system, which penalties should have offset the damages awarded Scheenstra.

### 1. *Previously Planned Production*

In calculating the aggregate production of the members under its formula, the trial court made an upward adjustment for dairies, like Scheenstra's, with previously planned and Cal Dairies's allowed expansion.

Cal Dairies argues that "the 2.7 million pound figure used by the court . . . does not necessarily represent the near term production of dairies with previously planned and [Cal Dairies's] allowed expansion." Cal Dairies also notes that "the trial court, itself, acknowledged that this number simply represents 'the most reliable figure,' of the evidence before the court."

The 2.7-million-pound figure comes from the second page of trial exhibit 24. The trial court described this exhibit as "the committee/staff write-up regarding the 'hardship appeals', stating that 32% of the requests cited new or ongoing expansion, for 2.7 million pounds . . . ."

Cal Dairies argument that the figure does not necessarily represent near term production fails to identify prejudicial error. The applicable legal standard requires that the court use some reasonable basis of computation. (*Allen v. Gardner* (1954) 126 Cal.App.2d 335, 340 [272 P.2d 99].) An award of damages computed on a reasonable basis will be upheld even if it is only an approximation. (*Ibid.*) The trial court's use of an estimate of the previously planned and Cal Dairies's allowed expansion does not violate the foregoing legal standard. In other words, the trial court did not need a figure for each

dairy with previously planned and allowed production to generate a reasonable computation of damages. Here, the staff writeup constitutes substantial evidence supporting the trial court's implied finding that the 2.7-million-pound figure provides a reasonable basis for calculating damages. Therefore, we conclude the trial court's use of that figure in approximating Scheenstra's damages does not constitute reversible error.

### 2. Unused Base of Dairies with Declining Production

Cal Dairies argues that the trial court could not make an appropriate damage calculation without evidence in the record of the amount of unused base of dairies with production that declined after 2007.

In calculating how much aggregate production exceeded Cal Dairies's handling capacity and, thus, the percentage reduction in production necessary to balance the two, the trial court considered whether to make a downward adjustment in the production number to account for the fact that some dairies had declining production. The court, however, made no such adjustment because there was a "paucity of evidence." The court considered Erba's statement that there were millions of pounds of base available for purchase, but recognized that the base available for sale might include members who chose to downsize after they learned they could sell any excess base. Consequently, the court concluded that the "figure is not sufficiently probative to use as part of the court's damages calculation."

A fundamental rule of appellate review is that the appellant must affirmatively show *prejudicial* error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) This rule is derived from the constitutional doctrine of reversible error. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 [109 Cal.Rptr.2d 256].) Here, Cal Dairies's argument about the failure to make a downward adjustment in the aggregate production number fails to identify any prejudice to Cal Dairies. If such a downward adjustment in aggregate production had been made, it would have been favorable to Scheenstra because it would have lowered the 2.6 percent reduction the trial court made to his production figure of 290,000 pounds to generate the base allocation of 282,460 pounds. In other words, Cal Dairies is complaining that the court did not include a calculation that would have increased the damages it was required to pay.

Furthermore, Cal Dairies has not demonstrated that, regardless of prejudice, an error occurred. Specifically, Cal Dairies has failed to demonstrate that the trial court's exclusion of this component from its calculation due to lack of evidence was contrary to California law, which requires only a reasonable basis for the calculation of damages, even if the amount awarded

is an approximation. (*Allen v. Gardner, supra*, 126 Cal.App.2d at p. 340; see Civ. Code, §§ 3301, 3359.)

### 3. Offset for the Tipton Dairy

Cal Dairies argues that under the trial court's damages calculation, production of other dairies would have been given production quotas 2.6 percent below their level of production and, as a result, Scheenstra's Tipton dairy would have experienced penalties. Cal Dairies claims that the penalties Scheenstra would have incurred at the Tipton dairy should have reduced the damages he was awarded for his Wasco dairy. We reject this argument.

First, it is not really a substantial evidence argument. It is a legal argument that the trial court excluded an item from the damage calculation, which caused the calculation to be wrong or incomplete under the measure of damages imposed by law. Cal Dairies, however, has not developed this argument sufficiently to establish legal error. Second, the contract for Scheenstra's Tipton dairy was not the same contract as the contract for the Wasco dairy. Thus, the damages awarded to remedy the breach of contract covering the Wasco dairy can be calculated and awarded without taking into consideration what might have happened under other contracts. The evidence supporting the trial court's calculation of the damages recoverable is not rendered insubstantial because the trial court did not reduce those damages by the penalties that might have been incurred at another dairy under another contract.

## V.   Cross-appeal and Claim for Lost Profits

### A.   Contentions of the Parties

Scheenstra contends that the trial court erred in not awarding (1) "additional damages for a recoupment of a larger percentage of the penalties [Cal Dairies] imposed" and (2) damages for the profits he would have made on the milk he would have produced but for Cal Dairies's breach of the contract.

Scheenstra argues the law on lost profits and the facts found by the trial court clearly require this court to reverse the lower court's error in not awarding lost profits. Scheenstra asserts that he should have been given a base allocation of 320,000 pounds per day and that, as a matter of law, he should have been awarded lost profit damages in the amount of approximately $2,266,955.[21]

---

[21] Scheenstra also acknowledges the possibility that this court might conclude further factfinding is necessary regarding lost profits and indicates that a reversal and remand for that factfinding would be the appropriate appellate relief.

Cal Dairies contends that Scheenstra's claim regarding lost profits improperly assumes no supply management program would have existed.

### B. *Principles of Law Regarding Damages for Breach of Contract*

■ Civil Code section 3300 states that, except where expressly provided by statute, the measure of damages for breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." This general principle is subject to certain limitations. ·

First, "[d]amages must, in all cases, be reasonable . . . ." (Civ. Code, § 3359.) Second, "[n]o damages can be recovered for breach of contract which are not clearly ascertainable in both their nature and origin." (Civ. Code, § 3301.) This general rule, when applied to the question whether lost profits are recoverable, produces the principle that lost profits "must also be proven to be certain both as to their occurrence and their extent, albeit not with 'mathematical precision.' " (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 975 [22 Cal.Rptr.3d 340, 102 P.3d 257]; see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774 [149 Cal.Rptr.3d 614, 288 P.3d 1237].) Third, "[e]xcept as expressly provided by statute, no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides." (Civ. Code, § 3358.)

### C. *Application of Damage Principles to This Case*

Scheenstra's theory for additional contract damages is grounded on the assertions that (1) if Cal Dairies had not breached the contract he would have been given a base allocation of at least 320,000 pounds per day and (2) even if production at this level was penalized 0.6 percent (which he argues is still an unfair penalty), his damages calculate out as $2,266,955.

The trial court found, and Scheenstra conceded, that Cal Dairies acted within the discretionary authority granted by the contract when it decided to implement a supply management program. Therefore, "all the detriment proximately caused" (Civ. Code, § 3300) by Cal Dairies's breach of contract is not the reduction in income *resulting from the quota system,* but the difference between what Cal Dairies paid Scheenstra under its quota system and what he would have been paid if Cal Dairies had assigned him a proper production quota—that is, one that complied with the contract. (Civ. Code, §§ 3300, 3358.)

The trial court found that 282,460 pounds per day was an appropriate production quota for Scheenstra. Scheenstra's position that he should have

been given a quota of 320,000 pounds directly contradicts this finding of fact. Thus, Scheenstra's argument that the facts found by the trial court clearly require this court to reverse the trial court's damage award is wrong—it simply fails to acknowledge one of the most pertinent findings of fact made by the trial court. Thus, Scheenstra has not attempted to show, much less demonstrated, that the trial court's finding that 282,460 pounds per day was a fair and equitable production quota lacks substantial evidentiary support. Consequently, we will not discuss in detail the application of the substantial evidence standard to the trial court's findings. Earlier in this opinion, we rejected Cal Dairies's argument that the trial court's damages calculations were not supported by substantial evidence. (See part IV.B., *ante.*) Here, we reiterate our conclusion that sufficient evidence supports the calculations employed by the court to find that a 282,460-pound quota was an appropriate basis for calculating damages.

In addressing Scheenstra's argument that the trial court misapplied the rules of law governing the recovery of lost profits, we will analyze whether the trial court correctly applied the rules of contract damages to its findings of fact. Civil Code section 3300 refers to "all the detriment proximately caused" by the breach of contract. Here, the detriment that resulted from the breach of contract is the reduction in payments caused by Scheenstra having a quota of 252,000 pounds per day instead of a quota of 282,460 pounds per day. The trial court determined the amount that would compensate Scheenstra for this detriment was $325,000. Furthermore, this award of damages complies with Civil Code section 3358, which prohibited the court from awarding Scheenstra a greater amount in damages for the breach of contract than he could have gained by Cal Dairies's full performance of the contract—that is, an assignment of an internal production quota of 282,460 pounds. Under the findings made by the trial court, Scheenstra's claim for damages based on a production quota of 320,000 pounds violates Civil Code section 3358 by claiming more than he would have received by full performance.

Finally, Scheenstra's argument that if he had been assigned a quota of 282,460 pounds per day, his income would have been higher because he would have delivered more milk to Cal Dairies is based on factual assertions that were not accepted by the trial court. For Scheenstra to demonstrate the trial court erred when it failed to accept this view of the facts, he must refer to evidence so strong that the trial court, as a matter of law, was required to find Scheenstra would have delivered more milk if given a larger quota. The evidence presented at trial does not meet this standard and, therefore, we conclude that the trial court did not err when it calculated damages based on the milk that actually was delivered to Cal Dairies by Scheenstra, rather than a hypothetical amount that he might have delivered.

In summary, the trial court properly applied the rules of law governing the award of damages for a breach of contract to its findings of fact when it determined Scheenstra's damages were $325,000 plus interest from the filing of the complaint.

## DISPOSITION

The judgment is affirmed. Each party shall bear its own costs on the appeal and cross-appeal.

Wiseman, Acting P. J., and Levy, J., concurred.

The petition of appellant California Dairies, Inc., for review by the Supreme Court was denied April 17, 2013, S209174.