Filed 12/16/13  Estancia Coastal v. KB Home Coastal CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ESTANCIA COASTAL, LLC, | D062219 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2010-00054047-CU-BC-NC) |
| KB HOME COASTAL INC., et al., | |
| Defendants and Appellants. | |
| ESTANCIA COASTAL, LLC, | D062885 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2010-00054047-CU-BC-NC) |
| KB HOME COASTAL INC., | |
| Defendant, Cross-complainant and Appellant; | |
| KB HOME, | |
| Defendant and Appellant; | |
| LO LAND ASSETS, LP., | |
| Cross-defendant and Respondent. | |

APPEAL from a judgment and orders of the Superior Court of San Diego County, Thomas P. Nugent, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Munger, Tolles & Olson, Daniel P. Collins and Daniel B. Levin for Defendant, Cross-complainant and Appellant and for Defendant and Appellant.

Payne & Fears, Daniel M. Livingston and Thomas L. Vincent for Plaintiff and Respondent and for Cross-defendant and Respondent.

KB Home Coastal Inc. (KB), a developer and builder, appeals the judgment awarding Estancia Coastal, LLC (Estancia), a financing company, approximately $6.5 million for governmental fees designed to mitigate the impact of the residential development of Old Creek Ranch on schools, parks, roadways, and water and sewer systems (collectively, the impact fees). Estancia's assignor, Lo Land Assets, LP (Lo Land), bought Old Creek Ranch, granted KB an option to develop and purchase the property in parcels, and hired KB to perform certain work needed to prepare the site for construction of homes. After KB decided not to exercise the option, Lo Land terminated its contracts with KB, contracted with another builder to complete the project, and sued KB for the impact fees. A jury determined KB breached its contractual obligation to pay the impact fees, and the trial court denied KB's motion for partial judgment notwithstanding the verdict (partial JNOV motion), which sought to eliminate the award of impact fees.

KB contends the judgment and the order denying its partial JNOV motion must be reversed because the jury erroneously interpreted the applicable contracts and, under the correct interpretation, it had no obligation to pay the impact fees. KB also appeals the orders awarding Estancia attorney fees and costs, contending elimination of the erroneously awarded impact fees from the judgment requires reversal of the cost and

2

attorney fee orders and remand for a redetermination of who is the prevailing party entitled to costs and fees. Agreeing with KB's contentions except as to costs, we reverse and remand for further proceedings.

## I.

## FACTUAL BACKGROUND

A.  *Establishment of the Parties' Contractual Relationship*

In early 2005, KB approached Lo Land about financing the development of Old Creek Ranch, which is located in the City of San Marcos (the City). The parties structured the project as a "land banking" transaction, whereby the developer identifies a property to be developed; the financer takes title and, in exchange for a fee, grants the developer an option to purchase and develop the property in parcels over time; and the financer hires the developer to complete certain site improvement work even if the developer decides not to exercise the option. The Old Creek Ranch transaction was completed by execution of the three contracts described below.

1.  *The Purchase Agreement*

KB entered into a purchase agreement (the Purchase Agreement) with the owner of Old Creek Ranch, Brookfield University Commons LLC (Brookfield). KB agreed to develop the property in accordance with certain covenants, conditions, and restrictions, and to build a certain combination of home types according to an agreed schedule. If KB failed to proceed with the development under these conditions, Brookfield had the option to repurchase Old Creek Ranch.

3

The Purchase Agreement imposed on KB certain "Buyer's Work Obligations," consisting of landscaping, construction, and other site development work. The Purchase Agreement also required KB to pay "Buyer's Fees," which included the five impact fees at issue.

KB later assigned its interest in the Purchase Agreement to Lo Land. Lo Land paid the purchase price and took title to Old Creek Ranch.

2.      *The Option Agreement*

In connection with the purchase of Old Creek Ranch, KB and Lo Land executed an Option Agreement pursuant to which Lo Land granted KB an exclusive option to purchase Old Creek Ranch in portions and over time. In exchange for the option, KB agreed to pay an initial deposit and to make monthly payments to Lo Land. For the option to remain effective, KB also had to acquire periodically a designated portion of Old Creek Ranch by paying the scheduled price. KB had the right to terminate the Option Agreement at any time by giving written notice to Lo Land and its designated outside counsel, and Lo Land had the right to terminate if KB failed to acquire portions of Old Creek Ranch in accordance with the schedule or otherwise defaulted.

The Option Agreement contained several provisions relevant to the issues raised on appeal. Section 6.1 obligated KB to pay certain development costs, including impact fees that accrued or became due during the term of the Option Agreement. Section 6.5 generally required KB to assume all of the obligations of the Purchase Agreement that otherwise would have belonged to Lo Land as the "Buyer." An indemnity clause required KB to defend and indemnify Lo Land against claims for impact fees and real

4

property taxes arising during the term of the Option Agreement and for other development-related fees required to be paid under the Purchase Agreement. A survival clause stated that unless expressly provided to the contrary in the Option Agreement, all obligations and indemnities would continue to be binding on the parties even after termination of the Option Agreement. Finally, a cost provision required the losing party in any litigation on the contract to pay the prevailing party's costs, including attorney fees.

      3.    *The Construction Agreement*

KB and Lo Land also executed a Construction Agreement, which obligated KB to perform certain "Work" needed to prepare the site for later construction of homes even if KB decided not to exercise its option to buy Old Creek Ranch. The Work consisted generally of grading the property; building roads; and installing fences, sewers, curbs, gutters, and water and utility lines. The Construction Agreement required KB to pay all "governmental fees" necessary to do the Work. In exchange, Lo Land agreed to reimburse KB for all costs of performing the Work, up to a maximum amount.

B.    *Termination of the Parties' Contractual Relationship and Post-termination Events*

On February 27, 2007, KB sent Lo Land a letter electing not to maintain its option under the Option Agreement. Lo Land responded with a letter, dated March 7, 2007, terminating the Option Agreement.

After termination of the Option Agreement, KB continued to perform the Work required by the Construction Agreement. The parties disputed whether the Work included construction of a swimming pool and a recreation center and other tasks, but

5

agreed to proceed with the tasks that they did not dispute. In the fall of 2008, Lo Land directed KB to stop all site development and advised KB it would proceed with another builder.

Approximately one year later, Lo Land sent KB a letter asserting it was responsible under the Construction Agreement for paying approximately $4.5 million in impact fees that would be incurred in connection with the development of Old Creek Ranch. Lo Land demanded payment within 10 days. KB refused the demand.

Lo Land subsequently assigned its rights and interests under the Option and Construction Agreements to Estancia. The parties stipulated that "Estancia stands in the shoes of [Lo Land]" and "holds all rights Lo Land had under the contracts." In addition, KB's parent, KB Home, agreed to be held jointly and severally liable with KB on the contracts.

II.

PROCEDURAL BACKGROUND

A.    *Pleadings*

Estancia sued KB for breach of contract. In its complaint, Estancia alleged that although it had performed all of its obligations under the Option and Construction Agreements, KB breached those agreements by refusing to pay certain property taxes, impact fees, and construction costs. To remedy these alleged breaches, Estancia sought damages and costs, including attorney fees.

KB filed an answer generally denying the allegations of Estancia's complaint and asserting several affirmative defenses. KB sought a judgment dismissing the complaint and awarding KB its costs, including attorney fees.

B.    *Motion in Limine*

Estancia moved in limine for an order prohibiting extrinsic evidence on the meaning of the parties' contracts from being presented to the jury, at least until the court decided which party was contractually responsible for paying the impact fees. Estancia argued the Court should interpret the contracts as a matter of law at the beginning of trial.

KB opposed Estancia's in limine motion. KB argued the court should deny the motion on procedural grounds because it was a belated attempt to obtain bifurcation or summary adjudication. KB also argued the motion should be denied on the merits because the court and the jury needed to hear the same evidence — the court to determine if the contracts were reasonably susceptible to differing interpretations, and the jury to resolve any factual disputes as to when the impact fees accrued or became due or whether the payment of the impact fees was necessary to complete the Work required by the Construction Agreement.

The court denied Estancia's motion on the ground that it was "not an in limine motion by any definition."

C.    *Conflicting Extrinsic Evidence Admitted at Trial*

In accordance with the trial court's in limine ruling, the parties offered conflicting testimony on their intent in entering into the Option and Construction Agreements. Typical of that evidence is the following testimony.

7

1.      *Estancia's Extrinsic Evidence*

Lisa Albanez, an investment manager for Lo Land, testified about her negotiations with KB concerning Old Creek Ranch. Albanez's understanding of the "general terms" of the transaction was that KB would be given an option to purchase the property and would be obligated "to design, engineer, develop, and construct finished lots on the property." According to Albanez, payment of government fees is "always the responsibility of the builder in this type of transaction"; Lo Land never agreed to finance any of the government fees that would be due on the property; and she informed several individuals at KB that payment of the government fees would be KB's responsibility. Albanez further testified that KB's assumption of all of the Buyer's obligations under the Purchase Agreement, including payment of all government fees and the finishing of the lots, "was a very material part of [the] negotiations"; indeed, "if KB was not willing to agree to this, then [Lo Land] could not move forward with the deal."

Albanez was the "lead negotiator" for Lo Land as to the Option Agreement. According to Albanez, section 6.1 was a "standard provision" regarding payment of taxes and fees, but section 6.5 was not a "typical provision" and was included so that "it was very clear" the obligations of the Buyer under the Purchase Agreement "stay[ed] with the builder." It was Albanez's "understanding that KB had the obligation under the [Purchase Agreement] to pay [impact] fees whenever they were due." Albanez also testified it was "very important" to her that "KB's obligations under the [Purchase Agreement] would survive any termination of the option." In that regard, Albanez explained that the indemnity and survival clauses were included in the Option Agreement because Lo Land

8

"wanted to be sure that KB was going to be responsible for all of the obligations . . . regardless of whether or not [KB] terminated the option to purchase the property." Without these "protections," Albanez testified, Lo Land would not have entered into the deal.

Albanez was also the "lead negotiator" for Lo Land as to the Construction Agreement. Albanez testified the description of the Work contained in the Construction Agreement was a "standard provision" that she "intended to be very broad . . . to make sure that all of the obligations, not just finishing the lots, were included." According to Albanez, a lot is "finished" when the site is complete, all government fees are paid, and the City approves it.[1] During the negotiations, Albanez told KB representatives that impact fees "would be [KB's] obligation and contribution to the cost of the finished lots."

Estancia also called Erica Bose, an attorney who represented Lo Land in the Old Creek Ranch transaction, to testify about her involvement in drafting the contracts. Bose testified Lo Land's "policy" was to "make sure [it] did not have to assume any obligations under the [P]urchase [A]greement short of, obviously, paying the purchase price." According to Bose, she had conversations with representatives of KB "about the fact that [the parties] were going to need to make significant modifications to the provisions of the

_____

[1]     Estancia's expert "real estate professional," Michael Ryan, gave a more extensive definition of the phrase "finished lot" at trial. Ryan testified that a finished lot is one "that you can start to build a complete house on. In the industry, a finished lot is a lot in a subdivision where all entitlements have been received, impact fees have been paid, all on- and off-site construction has been completed, the conditions of approval as they relate to the site improvements have been satisfied, including common area, and all that work . . . has been inspected and accepted by the City."

9

Option Agreement for Old Creek Ranch to make sure that it was clear where the allocation of responsibility with respect to [the Purchase Agreement] fell."

With respect to the Option Agreement, Bose testified that because Lo Land was not in the business of building homes or developing lots, she was "cautious" in drafting section 6.5 "to make it very clear" that KB had all the obligations of the Buyer under the Purchase Agreement. According to Bose, it was Lo Land's "intention for [section] 6.5 to survive the termination of the Option Agreement." She also explained that section 6.1 was a "general provision" that Lo Land included in its form option agreement; that section 6.5 was drafted specifically for the Old Creek Ranch deal; and that section 6.1 "was not intended to limit" the scope of section 6.5.

Bose also testified about her involvement in drafting the Construction Agreement. According to Bose, the description of the Work contained in the Construction Agreement was synonymous with construction of "finished lots," a phrase Bose acknowledged had been used in other documents forming a part of the Old Creek Ranch negotiations but not in the Construction Agreement itself.

2. *KB's Extrinsic Evidence*

Greg Gallagher, KB's former executive vice president, testified about his involvement in the Old Creek Ranch transaction. Gallagher signed the Purchase Agreement. He also acted as "the primary point of contact" for KB in negotiations with Lo Land concerning Old Creek Ranch, and later signed the Option and Construction Agreements.

10

Gallagher testified his "understanding" of section 6.1 of the Option Agreement was that KB had to pay any impact fees that became due and payable during the period KB was exercising its option rights. He further testified that he "underst[oo]d" section 6.5 to require KB to perform the obligations therein mentioned "[t]o the extent [KB was] the builder and [it] incur[red] those obligations."

Gallagher testified his "understanding" of the Construction Agreement was that it was "another financing opportunity for Lo Land to lend more money" for "infrastructure improvements to keep the process moving along for the home building effort." He did not recall any discussion that the description of the Work included the construction of "finished lots." Gallagher also testified that his "understanding" of section 2.6 of the Construction Agreement was that KB would have to pay whatever fees were required for it to perform the site development work. According to Gallagher, not all of KB's obligations under the Construction Agreement "remained" if KB decided not to exercise its option.

D.    *Verdict*

The jury returned a special verdict in which it found KB breached the Option and Construction Agreements. Under the Option Agreement, the jury awarded Estancia the following damages: $622,229.25 for property taxes, $6,464,071.84 for impact fees, and $2,706,074 for costs to complete site development work. Under the Construction Agreement, the jury awarded the same damages for impact fees and costs to complete site development work.

11

E.    *Partial JNOV Motion*

KB filed a partial JNOV motion (Code Civ. Proc., § 629) to exclude from the judgment the amount the jury had awarded Estancia for impact fees on the grounds that the award was contrary to the language of the contracts and was unsupported by substantial evidence.  Specifically, KB argued (1) the extrinsic evidence introduced at trial could not be considered in interpreting the contracts, because it consisted of improper opinion and statements of undisclosed subjective intent; (2) the interpretation of the contracts raised a question of law for the trial court; (3) under the proper interpretation of section 6.1 of the Option Agreement, KB had to pay only those impact fees that accrued or became due during the term of the Option Agreement; and (4) there was no substantial evidence that any of the impact fees awarded by the jury had accrued or become due before termination of the Option Agreement.

Estancia opposed the motion on multiple grounds.  Estancia asserted that by demanding the jury decide the breach of contract claims, KB forfeited its argument that the trial court must interpret the contracts.  Estancia also argued various contractual provisions, other documents, and witnesses' testimony constituted substantial evidence that it was the intent of the parties that KB build "finished lots," and substantial evidence showed that the impact fees were included in the cost to deliver such lots.

The trial court denied KB's partial JNOV motion, "find[ing] that there was sufficient evidence to support the verdict."

12

F.     *Judgment*

KB paid the award of property taxes, and the court entered judgment for Estancia in the amount of $9,170,145.84.  The judgment included an award of pre- and postjudgment interest.

G.     *Orders Awarding Attorney Fees and Costs*

Estancia moved for an award of attorney fees under the Option Agreement.  KB opposed the motion on the grounds, among others, that attorney fees were not recoverable for breach of the Construction Agreement and Estancia sought fees for tasks that were not reasonably necessary.  The court awarded the full amount of fees Estancia requested.  By separate order, the court awarded Estancia its claimed costs.

H.     *Appeals*

KB filed a notice of appeal from the judgment and the order denying its partial JNOV motion, and a separate notice of appeal from the orders awarding attorney fees and costs.  (Code Civ. Proc., § 904.1, subd. (a)(1), (2), (4).)  We consolidated the appeals.

III.

DISCUSSION

KB contends the judgment and the order denying its partial JNOV motion must be reversed because the trial court erroneously submitted the issue of who was contractually obligated to pay impact fees to the jury, and the jury's award of impact fees to Estancia was based on a legally incorrect interpretation of the parties' contracts.  According to KB, remand for entry of a new judgment deleting the award of impact fees is required.  KB also contends reversal of the judgment requires reversal of the orders awarding costs and

13

attorney fees. For reasons discussed below, we conclude KB is correct as to impact fees and attorney fees, but not as to costs.

A.     *The Award of Impact Fees Must Be Eliminated from the Judgment*

KB complains the jury improperly awarded Estancia nearly $6.5 million in impact fees because KB had no contractual obligation to pay them. To resolve this complaint, we must determine the scope of KB's contractual obligation to pay impact fees and whether KB breached that obligation, issues we take up in turn below.

　　1.     *KB Was Not Contractually Obligated to Pay the Impact Fees Awarded by the Jury*

　　　　a.     *The Proper Standard of Review Is De Novo*

We must first decide a threshold matter the parties vigorously dispute: What standard of review applies to interpretation of the parties' contracts? Estancia argues review for substantial evidence is the correct standard because at trial the parties presented conflicting extrinsic evidence on the meaning of the contracts. KB counters that de novo review is the proper standard because no conflicting competent extrinsic evidence was presented at trial. We agree with KB.

Appellate review of an interpretation of a written contract "is governed by the settled rule that where extrinsic evidence has been properly admitted as an aid to the interpretation of a contract and the evidence conflicts, a reasonable construction of the agreement . . . which is supported by substantial evidence will be upheld." (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747.) This rule applies only when competent extrinsic evidence is in conflict and interpretation turns on the credibility of

14

that evidence.  (*City of Hope Nat. Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 (*City of Hope*); *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 (*Winet*).)  Thus, an appellate court is not bound by an interpretation of a contract by a jury or a trial court if no extrinsic evidence was introduced, there was no conflict in the extrinsic evidence, or the interpretation was based on incompetent extrinsic evidence.  (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; accord, *City of Hope*, at p. 395; see *Rilovich v. Raymond* (1937) 20 Cal.App.2d 630, 639-640.)  "Under these circumstances, there is no issue of fact, and it is the duty of an appellate court to make the final determination in accordance with the applicable principles of law."  (*Estate of Platt* (1942) 21 Cal.2d 343, 352; accord, *Canaan Taiwanese Christian Church v. All World Mission Ministries* (2012) 211 Cal.App.4th 1115, 1124.)

Applying these rules, we must interpret the parties' contracts de novo because there was no conflict in *competent* extrinsic evidence as to their meaning.  The testimony of Albanez, Bose, and Gallagher as to what obligations each of them intended or understood the Option and Construction Agreements to impose regarding payment of impact fees exemplifies the conflicting extrinsic evidence introduced at trial.  (See pt. II.C., *ante*.)  Although Albanez and Bose testified they communicated some of their intents and understandings to KB representatives, there was no testimony that the KB representatives shared or agreed with those intents or understandings — in fact, Gallagher testified he had contrary intents and understandings.  The extrinsic evidence thus "amount[ed] to nothing more than a statement of what [each witness] personally believed the agreement of the parties to be," which is "immaterial" to the proper

15

interpretation of their agreement.  (*Brant v. California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 (*Brant*); see *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444 [witness's "opinion as to the meaning and legal effect of a contract" was inadmissible as to interpretation of contract]; *Achen v. Pepsi-Cola Bottling Co.* (1951) 105 Cal.App.2d 113, 123 [interpretation of contract is "not controlled in any sense by what either of the parties intended or thought its meaning to be"].)  In other words, *although the extrinsic evidence was conflicting, it was not competent extrinsic evidence*. (See, e.g., *PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 157 [a party's "subjective statements of 'understanding' are irrelevant . . . , particularly where there is no evidence that [the other party] had the same understanding"]; *Winet*, *supra*, 4 Cal.App.4th at p. 1166, fn. 3 ["While this 'subjective intent' evidence was conflicting, it was not *competent* extrinsic evidence, because evidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language."]; *Merced County Sheriff's Employee's Assn. v. County of Merced* (1987) 188 Cal.App.3d 662, 672, fn. 1 [a "party's subjective 'understanding' of the meaning of the written contract . . . does not present a credibility question"].)  Where, as here, there is no conflict in competent extrinsic evidence, the interpretation of a contract "becomes solely a judicial function" (*City of Hope*, *supra*, 43 Cal.4th at p. 395), and "is subject to independent review on appeal" (*Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 390 (*Scheenstra*); see *Winet*, at p. 1166 & fn. 3 [interpreting contract de novo when only conflict was in extrinsic evidence that was not competent]).

16

b.    *KB Did Not Lose Its Right to Urge De Novo Review on Appeal*

Estancia contends KB is "estopped" to argue we should interpret the contracts de novo because in the trial court KB: (1) contended the contractual provisions concerning impact fees were "ambiguous," and "demanded" the jury hear extrinsic evidence about those provisions; (2) "vigorously opposed" Estancia's in limine motion requesting the trial court decide who was contractually obligated to pay the impact fees without considering any extrinsic evidence; and (3) requested a jury instruction on ambiguity, and never sought a preverdict ruling from the court on any contract interpretation issues. These contentions have no merit.

First, KB never contended the jury needed to resolve any ambiguity *regarding who had the contractual obligation to pay impact fees*. To the contrary, KB repeatedly argued that issue presented a legal question for the court to decide. For example:

— In discovery responses cited by Estancia, KB stated certain terms and phrases used in the parties' contracts (e.g., "Work," "fees," and "governmental fees") were ambiguous. KB did not state the contracts were ambiguous as to who bore the obligation to pay impact fees.

— In opposing Estancia's motion in limine, KB stated its belief the contracts were not ambiguous as to its obligation to pay impact fees, and section 6.1 of the Option Agreement limited its obligation to fees that accrued or became due during the term of the Option Agreement. KB also stated it was "confident" that after the evidence was presented, the court would agree KB only had to pay impact fees that accrued or became due during the option term, and the jury would agree no such fees accrued or became due until after the option expired.

— During trial, when Estancia sought testimony from Bose and Albanez about their subjective intents and understandings as to whom the Option and Construction Agreements required to pay the impact fees, KB repeatedly objected on the ground such testimony was irrelevant to the proper legal interpretation of the contracts.

17

— After the jury returned its verdict, KB filed its partial JNOV motion, arguing Estancia's extrinsic evidence could not properly be considered in interpreting the contracts; interpretation raised a question of law for the court to decide; and under the correct interpretation, KB was not liable for the impact fees.

Second, KB did not lose its right to urge de novo review on appeal by opposing the in limine motion Estancia filed to preclude presentation of extrinsic evidence to the jury until after the trial court ruled on who was contractually obligated to pay the impact fees. In its opposition, KB asserted section 6.1 of the Option Agreement "clearly limited [its] obligation to pay only those fees that accrued or became due during the term of the Option Agreement," but because Estancia contended otherwise, the trial court *provisionally* had to hear extrinsic evidence to determine whether the contracts were reasonably susceptible to the different interpretations. In making this argument, KB simply urged the court to follow correct procedure.

> "Where the meaning of the words used in a contract is disputed, the trial court must *provisionally* receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. [Citations.] *Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face.* Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912, italics added.)

Although the court typically hears extrinsic evidence outside the presence of the jury (*Equitable Life Assurance Society v. Berry* (1989) 212 Cal.App.3d 832, 838), KB reasonably argued that for reasons of witness convenience and judicial economy, the court should not hold a separate hearing regarding extrinsic evidence because the jury

18

needed to hear that evidence and other testimony from the same witnesses in order to decide factual questions related to the issue of breach (e.g., when impact fees accrued or became due, and whether payment of impact fees was necessary to complete the Work). But, KB made very clear in its opposition that the contracts were not ambiguous as to the allocation of responsibility for payment of impact fees, it had no obligation to pay those fees, and it was "confident" the trial court would agree after hearing the extrinsic evidence.

Third, by agreeing to a jury instruction on ambiguity and by not moving for summary judgment, nonsuit, or directed verdict, KB did not lose its right to argue that we must interpret the contracts de novo. Estancia's contrary assertion is not supported by the case on which it exclusively relies, *Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565. Unlike the defendant in *Mozzetti*, KB did not request a jury instruction that was "tantamount to submitting the *legal* questions in dispute to the jury." (*Id.* at p. 573, italics added.) The jury instruction quoted by Estancia neither informed the jury that the parties had a dispute over who bore the contractual obligation to pay impact fees nor advised the jury how to resolve that dispute. Rather, the instruction informed the jury that the parties had a *factual* dispute over what physical tasks were included in the "Work" KB agreed to do and what types of associated expenses constituted the "fees" KB had to pay, and advised the jury of some factors to consider to resolve that dispute.[2] Further, unlike the

---

2       The instruction, based on CACI No. 314, stated:  "Estancia and KB dispute the meaning of terms contained in their contracts regarding the scope of work to be performed by KB and the fees that it would pay.  [¶]  In deciding what the terms of a

19

defendant in *Mozzetti*, KB did not fail to seek a determination of the legal issues by the trial court. (*Ibid.*) As *Mozzetti* recognized, a party may preserve a claim that the court should have decided disputed legal issues if it moves for summary judgment, nonsuit, or directed verdict, *or "seek[s] a court determination on the legal issues in any other way."* (*Ibid.*, italics added.) KB satisfied this preservation requirement by filing a partial JNOV motion. (See *Stevenson v. Oceanic Bank* (1990) 223 Cal.App.3d 306, 313, 318 [JNOV motion properly granted when jury awarded damages based on erroneous contract interpretation supported by incompetent extrinsic evidence]; *Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510 ["Where appropriate a *partial* JNOV may be granted."].)

In sum, we reject Estancia's argument that KB invited the error in the jury's determination of disputed contractual interpretation issues based upon incompetent extrinsic evidence. We hold KB did not lose its right to pursue its claim on appeal that we must interpret the contracts de novo.

      c.     *The Option Agreement Expressly Limits KB's Obligation to Pay Impact Fees to Those That Accrued or Became Due During the Term of the Option Agreement*

Applying the de novo standard of review, we now must determine the scope of KB's contractual obligation to pay impact fees. Our primary goal in interpreting a contract is to effectuate the mutual intention of the parties as it existed at the time the

_____

contract mean, you must decide what the parties intended at the time the contract was created. You may consider the usual and ordinary meaning of the language used in the contract as well as the circumstances surrounding the making of the contract."

contract was made.  (Civ. Code, § 1636; *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195.)  We ascertain such intention solely from the words of a written contract, if possible.  (Civ. Code, § 1639; *Continental Ins. Co.*, at p. 195.)  The words used in a contract, taken in their ordinary and popular sense unless used in a technical sense, govern interpretation of the contract as long as the words are clear and explicit and do not involve an absurdity.  (Civ. Code, §§ 1638, 1644; Code Civ. Proc., § 1861; *Continental Ins. Co.*, at p. 195.)  In short, to decide whether KB must pay the impact fees, "[w]e look to the contract itself and interpret it so as to give effect to the intent of the parties."  (*Sayble v. Feinman* (1978) 76 Cal.App.3d 509, 513 (*Sayble*).)

The parties explicitly set forth their intent concerning the payment of impact fees in section 6.1 of the Option Agreement, which states in pertinent part:

> "*It is the parties' intention that* [*Estancia*] *shall not be required, during the term of this Agreement, to incur any expense or other charge applicable to* [*Old Creek Ranch*] *except as expressly set forth herein*, so that all impositions, . . . utility expenses, construction costs, . . . development fees, community facility district fees or costs, storm water pollution prevention fees or costs, . . . and all other costs and expenses (but excluding income taxes and franchise taxes) of whatsoever character or kind, general or special, ordinary or extraordinary, foreseen or unforeseen, and of every kind and nature whatsoever related to [Old Creek Ranch] (collectively, '**Expenses**'), shall be paid or discharged by [KB] . . . .  The Expenses are additional Option consideration and are nonrefundable to [KB] and not applicable to the purchase price of the Condominiums.  Without limiting the foregoing, [*KB*] *shall . . . pay* prior to delinquency all real estate taxes, special taxes, assessments and other charges, including . . . *fees or costs pertaining to roadway, water, wastewater, impact or other fees* payable to the City or any other Approving Authority, or otherwise payable by [Estancia] and attributable to [Old Creek Ranch], *which accrue or become due during the term of this Agreement* (but regardless of whether such taxes . . . , assessments, fees or charges relate to periods prior to the term of this Agreement) . . . .  *After termination of this Agreement*, [*KB*] *shall have no further obligation to pay the Expenses as they relate to Condominiums*

21

*or Real Property not previously acquired by* [*KB*]; provided, however, nothing herein shall limit [KB's] obligations under Section 9.1 below." (Italics added.)

Section 9.1, the indemnity clause of the Option Agreement, requires KB to indemnify Estancia against "any loss, liability, claim, action or proceeding made against [Estancia] or [Old Creek Ranch] relating to impact fees . . . *arising for any time periods during and before the term of this Agreement*." (Italics added.)

As the italicized language above indicates, section 6.1 of the Option Agreement allocates the duty to pay impact fees based on the date the fees "accrue" or "become due" relative to the date the Option Agreement terminates. An impact fee accrues when it "come[s] into existence as an enforceable claim" or "vest[s] as a right." (Webster's 3d New Internat. Dict. (2002) p. 13, col. 2; accord, Black's Law Dict. (9th ed. 2009) p. 23, col. 2; see Webster's, p. 13, col. 3 [defining "accrued liability" as "the portion of an accruing liability that has become definitely ascertainable and chargeable though actual payment thereof is not yet due"].)[3] An impact fee becomes due when it "come[s] to exist" and "reache[s] the date at which payment is required." (Webster's, p. 195, col. 1 [defining "become"], p. 699, col. 2 [defining "due"]; see Black's, p. 574, col. 1 [defining "due" as "[i]mmediately enforceable" or "[o]wing or payable"].) Thus, under the plain meaning of section 6.1, KB had to pay an impact fee if the governmental entity's right to

---

3 We must interpret the words "accrue" and "become due" in their ordinary and popular sense because the parties did not give them a special or technical meaning. (Civ. Code, § 1644; Code Civ. Proc., § 1861.) In doing so, we may consult dictionaries, where the ordinary and popular sense of a word is found. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253, 1263; *Scott v. Continental Ins. Co.* (1996) 44 Cal.App.4th 24, 30.)

collect the fee arose or came into existence during the time period the Option Agreement was in effect, regardless of whether the governmental entity could demand payment of the fee immediately or only at a future time. Once the Option Agreement terminated and KB had acquired no portion of Old Creek Ranch, however, KB had no obligation to pay any new impact fees that arose going forward; but KB did retain a duty to indemnify Estancia against claims for payment of impact fees that a governmental entity previously had acquired a right to collect. Since these temporal limitations on KB's duty to pay impact fees are clear and explicit and do not involve an absurdity, they govern. (Civ. Code, §§ 1638, 1639; *County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 415; *Valencia v. Smyth* (2010) 185 Cal.App.4th 153, 177.)

2. *KB Did Not Breach Its Contractual Obligation to Pay Impact Fees*

Next, we must determine whether KB breached its contractual duty by refusing to pay impact fees that accrued or became due during the time the Option Agreement was in effect. The parties agree that whether a party breached a contract is a question of fact (*Moresco v. Foppiano* (1936) 7 Cal.2d 242, 245; *Kotler v. PacifiCare of California* (2005) 126 Cal.App.4th 950, 956), to which we apply the substantial evidence standard of review (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429; *Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 170). The record here contains no substantial evidence of any breach by KB. The parties agree the Option Agreement

23

terminated no later than March 7, 2007, and undisputed evidence shows that none of the impact fees awarded by the jury accrued or became due by then.[4]

The impact fees awarded by the jury included those for schools, parks, roadways, and water and sewer facilities. The City had no legal right to collect school impact fees until it had approved and issued a building permit. (Ed. Code, § 17620, subd. (b); Gov. Code, § 65974, subd. (c); San Marcos Mun. Code, § 17.52.050, subd. (i).) Park and roadway impact fees likewise were "due and payable upon issuance of a building permit by the City." (San Marcos Mun. Code, §§ 17.36.040, 17.44.070.)[5] According to Estancia, building permits were issued at various times from June 2009 through April 2011, more than two years after termination of the Option Agreement. Water and sewer impact fees did not become "owing, due, and payable" until applications for service were submitted to the Vallecitos Water District (the District). (Vallecitos Water Dist. Ord. Nos. 122, § 9, 138, § 9, 139, § 8.)[6] Those applications were not submitted until August 4, 2009, and fees were not paid until the following December.

---

[4] Because the operative facts concerning breach of contract are not in dispute, the de novo standard of review would appear to be more appropriate. (See, e.g., *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68; *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 (*Ghirardo*); *Scheenstra*, *supra*, 213 Cal.App.4th at p. 391.) As explained in the text, however, even under the more deferential substantial evidence standard urged by the parties, KB is not liable for breach.

[5] Estancia's expert witnesses agreed school, park, and roadway impact fees had to be paid to obtain a building permit.

[6] The District's engineer, Kenneth Gerdes, whom Estancia called as a witness, agreed water and sewer impact fees must be paid when a customer requests service.

24

In sum, the evidence shows that all of the impact fees KB challenges on appeal accrued or became due *after* termination of the Option Agreement.  Hence, under the plain terms of section 6.1, KB had no contractual obligation to pay any of them.

3. *None of Estancia's Arguments in Support of the Award of Impact Fees Has Merit*

Estancia advances several arguments in defense of the jury's award of impact fees. As we explain below, none is persuasive.

a. *KB Did Not Waive Its Right to Appeal by Failing to Discuss All Material Evidence in Its Opening Brief*

Estancia contends KB waived its right to appeal under the rule that unless an appellant challenging the sufficiency of the evidence to support a verdict sets forth in its brief all material evidence — not just the evidence supporting the appellant's position, but also that supporting the respondent's position — the challenge is deemed waived. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)  Although in its briefs KB did not cite so much of the evidence supporting Estancia's position as did Estancia in its brief, KB did discuss the contract provisions, documents, and testimony relevant to our resolution of the issues raised on appeal.  There has been no waiver.

b. *Section 6.1 of the Option Agreement Does Not Require KB to Pay the Impact Fees*

Estancia next argues section 6.1 of the Option Agreement requires KB to pay the impact fees because the record contains substantial evidence that KB's "impact fee obligations" accrued during the option term, even though the fees themselves might not have been due and payable during that term.  According to Estancia, KB immediately

25

obligated itself to pay the impact fees when it signed the Purchase Agreement and the Option Agreement; when the Development Declaration was recorded; when the City issued its conditions of approval for the development of Old Creek Ranch; and when the District demanded payment of water and sewer impact fees in November 2006. We are not persuaded.

To the extent Estancia bases its argument on the provisions of the Purchase Agreement, the Option Agreement, and the Development Declaration, Estancia confuses the issue of when KB's executory obligation to pay impact fees arose with the issue of when a particular impact fee accrued or became due. Although KB assumed an obligation to pay impact fees when it signed the Purchase and Option Agreements, and the Development Declaration confirmed that obligation insofar as it was based on the Purchase Agreement, section 6.1 of the Option Agreement expressly limited that obligation to impact fees "which accrue or become due during the term of this Agreement." Thus, to trigger KB's obligation to pay an impact fee, *the specific impact fee itself must have accrued or become due during the term of the Option Agreement.* Because, all of the impact fees at issue on appeal accrued or became due *after* termination of the Option Agreement, KB had no obligation to pay any of them.

Estancia also asserts the accrual of KB's impact fee obligations was affirmed when the City imposed conditions of approval on the development of Old Creek Ranch. Estancia cites no legal authority to support this assertion. The only evidence Estancia cites is testimony from Ryan, its expert "real estate professional," that "impact fees are normal and customary in the real estate industry"; "the City puts them in the conditions of

26

approval" because "they are paid by the developer of the site," not by the project lender; and a "shift in timing" of the payment of impact fees does not "shift[] the obligation" to pay them. None of this generalized testimony about who customarily pays impact fees for a real estate development project indicates when any particular impact fee accrued or became due as to Old Creek Ranch, the issue determinative of KB's obligation to pay such a fee. Ryan's opinions about who ordinarily has to pay impact fees are not binding on us, because the determination of KB's obligation to pay impact fees depends on the interpretation of statutes, ordinances, and contracts, and their application to undisputed facts, which are all matters subject to our de novo review. (*City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1081; *Scheenstra*, *supra*, 213 Cal.App.4th at pp. 390-391; *Herman v. Los Angeles County Metropolitan Transportation Authority* (1999) 71 Cal.App.4th 819, 825.)

Lastly, Estancia maintains the water and sewer impact fees accrued and became due in November 2006 when the District demanded payment of those fees. We disagree. Although in November 2006 the District did demand payment of impact fees as a condition of final approval of the development plans, the District later withdrew that demand. At trial, Gerdes, the District's engineer, testified that when he signed off on the plans on March 13, 2007, the water and sewer impact fees were not yet due. Gerdes explained that the fees for Old Creek Ranch had to be paid "prior to hook-up or prior to taking service, actually turning on the meter and taking service," "either through water meters or through the public sewer." Gerdes further testified that water and sewer impact fees are not like property taxes, which accrue during the year but are not payable until a

27

later date, because water and sewer impact fees do not have to be paid unless and until there is a request for service. Gerdes's testimony is consistent with the District's ordinances, which provide that water and sewer impact fees "shall become owing, due, and payable at the time application is made to connect to the District's water [or sewer] system." (Vallecitos Water Dist. Ord. Nos. 122, § 9, 138, § 9, 139, § 8.) Because no such application was made until 2009, the water and sewer impact fees did not accrue or become due before termination of the Option Agreement in March 2007.

c.      *Section 6.5 of the Option Agreement Does Not Require KB to Pay the Impact Fees*

Estancia also contends section 6.5 of the Option Agreement requires KB to pay the impact fees. That provision states: "[KB] agrees and acknowledges that it is the intent of the parties that notwithstanding the fact that [Estancia] acquired [Old Creek Ranch] as the 'Buyer' under the Purchase Agreement, all the obligations of . . . 'Buyer' under the Purchase Agreement . . . shall be performed by and shall be the sole obligations of [KB]." Among the many obligations the Purchase Agreement imposed on the Buyer was the obligation to pay specified "Buyer's Fees," including the impact fees. According to Estancia, section 6.5 was specifically negotiated to ensure that KB retained full responsibility for the impact fees *no matter when due*, and section 6.1 was not intended to limit the scope of section 6.5. We perceive at least three flaws in this argument.

First, to the extent general and specific contract provisions conflict, the specific provision controls. (Civ. Code, § 3534; Code Civ. Proc., § 1859; *National Ins. Underwriters v. Carter* (1976) 17 Cal.3d 380, 386 (*Carter*); *Ovitz v. Schulman* (2005)

28

133 Cal.App.4th 830, 855 (*Ovitz*).)  Here, the temporally limited duty to pay impact fees specifically prescribed by section 6.1 prevails over the broad duty to perform all of the Buyer's obligations under the Purchase Agreement generally prescribed by section 6.5.

Second, Estancia's interpretation of section 6.5 effectively reads section 6.1 out of the Option Agreement.  If, as Estancia insists, section 6.5 requires KB to pay impact fees no matter when due, the explicit language of section 6.1 restricting KB's payment obligation to fees that accrued or became due during the term of the Option Agreement would be nullified.  A court should not interpret a contract so as to render a provision inoperative or meaningless.  (Code Civ. Proc., § 1858; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 957; *Kavruck v. Blue Cross of California* (2003) 108 Cal.App.4th 773, 783.)  Rather, a court should strive to give effect to every contractual provision and to avoid making any superfluous.  (Civ. Code, § 1641; *Carson v. Mercury Ins. Co.* (2012) 210 Cal.App.4th 409, 420; *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1027).  We thus interpret section 6.1 to govern KB's obligation to pay impact fees and section 6.5 to govern other obligations KB assumed under the Purchase Agreement.

Third, interpreting section 6.5 of the Option Agreement as overriding the temporal limitations of section 6.1 would upset the parties' basic bargain and produce an unjust result.  A court must give a contract a reasonable and commonsense interpretation that is consistent with the parties' apparent purpose in entering into the contract.  (Civ. Code, § 1643; *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 526; *Howe v. American Baptist Homes of the West, Inc.* (1980) 112 Cal.App.3d 622,

29

626.) Here, the parties' contractual relationship was essentially a financing arrangement: Lo Land, Estancia's assignor, bought Old Creek Ranch for $52 million and granted KB an option to purchase and develop the property in parcels over time, and in exchange KB paid Lo Land $17.7 million in initial and monthly payments to keep the option open. The Option Agreement also required KB to pay impact fees that "accrued or become due during the Option Term" as "additional consideration" for the option and as a "condition" to keeping it open. Although it is economically rational for KB to agree to pay impact fees that arose during the option term as additional consideration to keep the option open, it is not economically rational for KB to agree to pay impact fees that arose after Lo Land terminated the Option Agreement. Rather, it would be inequitable to require KB to pay not only the $17.7 million it had already paid to keep the option open but also the $6.5 million in post-termination impact fees as "additional consideration" for an option it no longer had a right to exercise. Since we must adopt an interpretation that makes a contract fair and reasonable rather than one that leads to a harsh and illogical result (Code Civ. Proc., § 1866; *Cohn v. Cohn* (1942) 20 Cal.2d 65, 70; *Chavez v. Indymac Mortgage Services* (2013) 219 Cal.App.4th 1052, 1058; *Cooper v. Mart Associates* (1964) 225 Cal.App.2d 108, 116), we reject Estancia's claim that section 6.1 was not intended to limit the scope of section 6.5.

> d. *The Survival Clause of the Option Agreement Does Not Require KB to Pay the Impact Fees*

Estancia claims that under the survival clause of the Option Agreement, KB's obligation to pay impact fees remained a binding obligation regardless of whether the

30

option was exercised or terminated. We disagree. As pertinent here, the survival clause states: "*Unless expressly provided to the contrary herein*, . . . all obligations and indemnities contained in this Agreement shall survive the . . . termination of this Agreement, so that such obligations and indemnities shall continue to be binding upon the parties hereto . . . ." (Italics added.) Section 6.1 of the Option Agreement "expressly provided to the contrary" by stating: "After the termination of this Agreement, [KB] shall have no further obligation to pay the Expenses[,]" including impact fees. Although Estancia ignores the limiting language of the survival clause italicized above, we must give effect to such clear and explicit language. (Civ. Code, § 1638; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; *Brandt v. Lockheed Missiles & Space Co.* (1984) 154 Cal.App.3d 1124, 1129-1130.)

e. *The Indemnity Clause of the Option Agreement Does Not Require KB to Pay the Impact Fees*

Next, Estancia asserts the indemnity clause of the Option Agreement requires KB to pay the impact fees. Estancia is incorrect. As pertinent here, the indemnity clause requires KB to indemnify Estancia against "any loss, liability, claim, action or proceeding made against [Estancia] or [Old Creek Ranch] relating to impact fees and/or real property taxes *arising for any time periods during and before the term of this Agreement*." (Italics added.) Under this plain language, KB is not liable for the impact fees because all of them arose *after* Estancia terminated the Option Agreement. The indemnity provisions on which Estancia relies relate more generally to obligations of the Buyer under the Purchase Agreement and do not override the provision specifically governing impact

31

fees.  (Civ. Code, § 3534; Code Civ. Proc., § 1859; *Carter*, *supra*, 17 Cal.3d at p. 386; *Ovitz*, *supra*, 133 Cal.App.4th at p. 855.)

    f.  *The Construction Agreement Does Not Require KB to Pay the Impact Fees*

  Finally, Estancia argues the jury properly awarded impact fees based on KB's breach of the Construction Agreement.  In support of this argument, Estancia contends: (1) the Work to be performed under the Construction Agreement itself included payment of impact fees; and (2) the Construction Agreement required KB to complete all work necessary to deliver "finished lots," and impact fees had to be paid for lots to be considered "finished."  We reject these contentions as inconsistent with the plain language of the Construction Agreement.

  Two provisions of the Construction Agreement are pertinent here.  Section 1.1 required KB to "perform and complete the 'Work,'" which was defined as "the *construction and services* required by (and reasonably inferable from) the 'Contract Documents' . . . , whether completed or partially completed, and includes all *labor, materials, equipment and services* provided or to be provided by [KB] to fulfill [its] obligations under this Agreement."  (Italics added.)  Section 1.1 further provided:  "The Work consists generally of the construction of certain roads, fencing, sewers, curbs, gutters, grading, water lines and utility lines within, and adjacent to, [Old Creek Ranch]."  Section 2.6 of the Construction Agreement obligated KB to "secure and pay for all approvals, easements, assessments, charges, permits and governmental fees, licenses and inspections *necessary for proper execution and completion of the Work*."  (Italics added.)

32

Thus, KB had to pay all governmental fees required to grade, fence, construct roads, install utility lines, and otherwise physically improve Old Creek Ranch so that homes could be built on it.

That obligation did not include payment of any of the impact fees awarded by the jury. The school, park, and roadway impact fees did not have to be paid until approval and issuance of building permits for homes; and the water and sewer impact fees did not have to be paid until application was made to connect the homes to the District's facilities and obtain service. (See pt. III.A.2, *ante*.) Payment of those impact fees was therefore not necessary unless and until homes were built. The Construction Agreement, however, did not obligate KB to build any homes. The Work that section 1.1 required KB to perform consisted only of physical tasks needed to *prepare* the site for later home building. Accordingly, under section 2.6, KB did not have to pay the impact fees because they were not "necessary for proper execution and completion of the Work."

Ignoring the contractual language and quoting only extrinsic evidence, Estancia claims the definition of Work contained in the Construction Agreement includes payment of impact fees.[7] That claim is untenable. Section 1.1 defines the Work generally as

_____

[7]     Estancia asserts "Gallagher admitted that the 'Work' to be performed under the Construction Agreement included impact fees," but the testimony Estancia quotes belies that assertion. When asked whether it was his "understanding that the work to be done under the Construction Agreement included impact fees," Gallagher responded, "I think the work included whatever we were doing . . . to construct and build homes. So *if* it . . . incurred a fee, *then* we would have to pay that as the builder." (Italics added.) Gallagher later explained: "[T]his doesn't really talk about the homes. This talks about the completion of the 'Work.' So if we had to get a grading permit, for instance, we would have to pay for a grading permit." Hence, Gallagher's testimony is consistent with the

33

"construction and services," and then lists "roads, fencing, sewers, curbs, gutters, grading, water lines and utility lines" as specific examples of the types of construction or services included within the definition. "[W]here specific words follow general words in a contract, 'the general words are construed to embrace only things similar in nature to those enumerated by the specific words.'" (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1045.) Payment of impact fees constitutes neither "construction" nor "services," and it bears no resemblance to grading, fencing, building roads, installing utility lines, or doing any of the other physical tasks needed to prepare Old Creek Ranch for later home building. Hence, contrary to Estancia's claim, we conclude that paying impact fees was not part of the Work the Construction Agreement required KB to do.

We also reject Estancia's contention that the Construction Agreement required KB to do all work necessary to deliver "finished lots," a phrase Estancia claims is understood in the real estate industry to mean subdivision lots for which, among other things, impact fees have been paid. (See fn. 1, *ante*.) As Estancia acknowledges in its briefing, the quoted phrase never appears in the Construction Agreement, although the parties included it in the letter of intent that preceded the final contracts. "The execution of a contract in writing . . . supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." (Civ. Code, § 1625.) Thus, when interpreting a contract, a court's task "is simply to ascertain and declare what

requirement of section 2.6 that KB pay only those governmental fees necessary to complete the Work. In any event, Gallagher's "understanding" of the Construction Agreement is irrelevant to its proper interpretation. (*Brant*, *supra*, 4 Cal.2d at p. 133; *Winet*, *supra*, 4 Cal.App.4th at p. 1166, fn. 3.)

is in terms or in substance contained therein, not to insert what has been omitted."  (Code Civ. Proc., § 1858; see *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 954.) "This court has neither the power to make for the parties a contractual arrangement which they themselves did not make nor to insert in the agreement language that [one party] now wish[es] were there."  (*Sayble*, *supra*, 76 Cal.App.3d at p. 515.)  If Estancia wanted delivery of "finished lots," it should have included that phrase in the Construction Agreement.  But it did not.

Estancia asserts, however, that KB's statement in discovery responses that the term "Work" was ambiguous as used in the Construction Agreement permitted the jury to resolve the ambiguity in Estancia's favor based on extrinsic evidence that the term essentially meant construction of lots for which impact fees had been paid.  We disagree. The ambiguity KB perceived was whether the construction of a swimming pool and other improvements fell within the definition of Work, not whether the payment of impact fees was included in the definition.  On the issue of the obligation to pay impact fees, KB's consistent position at trial was that the parties' contracts were not ambiguous and extrinsic evidence was not properly considered by the jury.  Moreover, "[e]ven where extrinsic evidence in aid of interpretation was offered in the trial court, the appellate court is not bound by the [jury's] findings if the extrinsic evidence . . . is inconsistent with the only interpretation to which the instrument is reasonably susceptible."  (*Pasadena Police Officers Assn. v. City of Pasadena* (1983) 147 Cal.App.3d 695, 707.)  Estancia's extrinsic evidence is inconsistent with the plain language of the Construction Agreement requiring KB to pay only those governmental fees needed to get the site ready for home building,

35

because the impact fees did not have to be paid unless and until homes were built. That evidence therefore cannot support the jury's award of impact fees.

B. *The Trial Court Must Reconsider the Attorney Fee Award but Not the Cost Award*

KB contends reversal of the judgment to eliminate the award of impact fees requires reversal of the orders awarding costs and attorney fees and remand for redetermination of who is the prevailing party. We agree as to attorney fees, but not as to costs.

1. *The Trial Court Must Determine Anew Who Is the Prevailing Party for Purposes of Attorney Fees*

In light of our decision that Estancia is not entitled to recover any impact fees, the trial court must reconsider its award of attorney fees. Estancia sought and obtained attorney fees on the basis of the following provision of the Option Agreement:

> "If there is any legal action or proceeding between the parties to enforce or interpret any provisions of this Agreement or to protect or establish any right or remedy of any of them hereunder, the unsuccessful party to such action or proceeding shall pay to the prevailing party all costs and expenses (including, but not limited to, reasonable attorneys' fees and costs) incurred by such prevailing party in such action or proceeding."

The prevailing party under this provision is "the party who recovered a greater relief in the action on the contract." (Civ. Code, § 1717, subd. (b)(1).) Based on the jury's verdict, Estancia was the prevailing party because it had obtained "a 'simple, unqualified win'" on each of its contract claims. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 (*Hsu*).) Our conclusion the jury erroneously awarded the impact fees changes the outcome to a mixed result, however, with Estancia prevailing on its claims for property taxes and costs

36

to complete site development work,[8] and KB prevailing on Estancia's claim for the impact fees. In such a situation, where neither party won a complete victory on all contract claims, the trial court has discretion to determine which party prevailed or whether, on balance, neither party prevailed sufficiently to justify an attorney fee award. (Civ. Code, § 1717, subd. (b)(1); *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109.) We therefore reverse the order awarding attorney fees and remand the matter to allow the trial court to exercise its discretion. (See, e.g., *Ghirardo*, *supra*, 8 Cal.4th at pp. 808-809 [reversing damages award and remanding for reconsideration of prevailing party issue]; *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1097 [same].)

For the guidance of the trial court on remand, we note that in deciding whether there is a prevailing party for purposes of awarding attorney fees, the "court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. The prevailing party determination is to be

---

[8]     We reject KB's argument that Estancia is not entitled to attorney fees based on the award of costs to complete site development work because that award rested solely on breach of the Construction Agreement. The Option Agreement defined a failure to perform under any of the "Builder's Agreements," which included the Construction Agreement, as a default that entitled Estancia to recover damages for breach of the Option Agreement. Estancia's claim for costs to complete the site development work thus fell within the scope of the attorney fee clause because the claim constituted an "action or proceeding between the parties . . . to protect or establish any right or remedy" under the Option Agreement. It is too late for KB to argue that its breach of the Construction Agreement did not qualify as a default under the Option Agreement on the ground that Estancia did not provide the required written notice of breach. KB did not argue that factual point in the trial court in opposition to Estancia's attorney fee motion and may not do so for the first time on appeal. (See, e.g., *Silk v. Feldman* (2012) 208 Cal.App.4th 547, 555; *Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591-592.)

37

made only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.'" (*Hsu*, *supra*, 9 Cal.4th at p. 876.) The trial court must "identify the party obtaining '*a greater relief*' by examining the results of the action in relative terms: the general term 'greater' includes '[l]arger in size than others of the same kind' as well as 'principal' and '[s]uperior in quality.'" (*Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136, 1151.) In mixed result cases like this one, the court also may determine there is no prevailing party for purposes of attorney fees. (Civ. Code, § 1717, subd. (b)(1).) "'[T]ypically, a determination of no prevailing party results when both parties seek relief, but neither prevails, or when the ostensibly prevailing party receives only a part of the relief sought.'" (*Hsu*, at p. 875.) We express no opinion on which party, if any, the trial court on remand should determine to be the prevailing party.

> 2.  *Estancia Is the Prevailing Party for Purposes of Costs*

Finally, we summarily reject KB's suggestion in a footnote in its opening brief that we must also vacate the order awarding costs and remand for reconsideration. As "the party with a net monetary recovery," Estancia is the prevailing party entitled to costs "as a matter of right," even though it did not prevail on all of its claims for damages. (Code Civ. Proc., § 1032, subds. (a)(4), (b); see *Dell'Oca v. Bank of New York Trust Co., N.A.* (2008) 159 Cal.App.4th 531, 559.)

## DISPOSITION

The judgment, the order denying KB's partial JNOV motion, and the order awarding Estancia attorney fees are reversed. The order awarding costs is affirmed. The

38

matter is remanded to the trial court with directions (1) to enter a new order granting KB's partial JNOV motion; (2) to enter a new judgment deleting the jury's award of $6,464,071.84 for impact fees, awarding Estancia damages in the total amount of $2,706,074 for costs to complete site development work, and recalculating prejudgment interest on that amount; and (3) to conduct further proceedings to determine whether either Estancia or KB is a prevailing party entitled to attorney fees, and if so, to award the prevailing party a reasonable amount of fees.  Costs on appeal are awarded to KB.

_____

IRION, J.

WE CONCUR:

_____

HUFFMAN, Acting P. J.

_____

McDONALD, J.

39